**Robert A. LIPSON, M.D., and Anesthesiology/Critical Care Physicians of Delaware, P.A., Plaintiffs,**

v.

**ANESTHESIA SERVICES, P.A., Defendant.**

**Civil Action No. 00C–08–105JRS.**

Superior Court of Delaware, New Castle County.

Submitted: July 9, 2001.

Decided: Oct. 3, 2001.

---

James S. Green, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE, for the Plaintiffs.

Jeffrey M. Weiner, Wilmington, DE, for the Defendant.

## MEMORANDUM OPINION

SLIGHTS, J.

### I. INTRODUCTION

This controversy illustrates the unfortunate sequelae of professional separation on less than amicable terms. Plaintiffs, Robert A. Lipson, M.D. ("Lipson"), and his solely owned medical practice, Anesthesiology/Critical Care Physicians of Delaware P.A. ("ACCP") (collectively "Plaintiffs"), initiated this action against Lipson's former medical practice, Anesthesia Services P.A. ("ASPA"), after Lipson's departure from ASPA. Plaintiffs recite facts in their complaint that they shape into themes quite familiar to professional separation litigation: Lipson's partners improperly discharged him from ASPA in violation of his contract with the practice; his partners slandered him by publicly criticizing his professional competence; his partners unfairly prevented him from competing in the community; and his partners inappropriately interfered with his current or prospective professional relationships with patients, colleagues and the hospitals where he practiced medicine.

The defense themes are also familiar: ASPA's concerns regarding Lipson's competency and unprofessional conduct were justified; ASPA's responses to these concerns were appropriate; and ASPA's actions after Lipson's separation from ASPA in no way improperly interfered with Lipson's ability to practice medicine in the community and, if anything, constituted ASPA's exercise of its right freely to compete with Lipson or any other provider of anaesthesia services.

But there is a twist in this case that has prompted a defense motion for summary

judgment on all counts of the complaint long before the discovery record has been completed. During most of the events in question, ASPA constituted, in essence, the entire department of anaesthesiology at Christiana Care Health Services ("CCHS"), the largest hospital system in the State of Delaware. ASPA has argued that it was engaged in peer review activity on behalf of (and at the request of) CCHS when it responded to staff complaints about Lipson's competency and unprofessional behavior at the hospital and thereafter implemented the corrective action which ultimately led to Lipson's departure from ASPA. Accordingly, ASPA contends that its conduct implicates the peer review immunity codified in the Federal Health Care Quality Improvement Act[1] and Delaware's Medical Practices Act.[2]

To dispose of ASPA's motion for summary judgment, the Court must interpret the boundaries of the peer review immunity enjoyed by Delaware health care providers in a case of first impression. The Court also must address whether common law privileges that have developed in Delaware's libel/slander jurisprudence apply when medical professionals purportedly make slanderous statements while engaged in quality assurance activities. This too is an issue of first impression in Delaware. The remaining issues raised by the motion, while not novel in their legal complexity, are fact intensive against the backdrop of a rather limited but complicated record and, in that sense, are challenging in their own right.

After full briefing, oral argument and supplemental briefing, the matter is ripe for decision. For the reasons that follow,

the motion for summary judgment is GRANTED in part and DENIED in part.

## II. FACTS

### A. The Parties

ASPA is a Delaware corporation with over twenty equity partners, more than 30 anesthesiologists (including the partners), and more than 60 certified registered nurse anesthetists ("CRNAs"). From February 1987 through November 1999, ASPA provided non-cardiac anesthesia services on an exclusive basis for CCHS at its two hospital campuses and its various surgicenters. This relationship, described by ASPA as a "de facto exclusive provider" arrangement, apparently was not governed by contract. Nevertheless, the parties do not dispute that, during the time frame relevant to this dispute, ASPA ran the hospital's anaesthesia department. (D.I. 24, Ex. B at 1–2)

The parties also agree that one of ASPA's partners, Lennart Fagraeus, M.D. ("Fagraeus"), was the Chairman of the Department of Anaesthesiology and that he received a salary from CCHS to perform that function over and above the salary he received from ASPA. In his role as Chairman of the department, Fagraeus undertook various administrative tasks, including the scheduling of anesthesiologists for operating room coverage. Specifically, through a committee of physicians comprised of ASPA physicians, Fagraeus scheduled, on a random and rotational basis,[3] each anesthesiologist and CRNA for each operation performed in a CCHS operating room. (D.I. 24, Ex. B at 3)

**1.** 42 U.S.C. § 11101 *et seq.*

**2.** 24 Del. C. § 1701, *et seq.*

**3.** According to ASPA, although the operating room assignments were random, the physi-

cians' committee would accommodate requests for a specific anaesthesiologist made by either the surgeon or patient. (D.I. 24, Ex. B at 3)

Lipson joined ASPA in 1987. He became a stockholder of ASPA and a member of its board of directors in November 1988. (D.I. 24, Ex. B at 2) He is a board certified anesthesiologist with a particular interest in critical care medicine.[4] From the time he joined ASPA through early 1999, Lipson enjoyed an excellent reputation at CCHS among his fellow anesthesiologists and the community of surgeons with whom he worked. The state of Lipson's reputation thereafter is the subject of some dispute in the record.

**B. Lipson's Relationship with ASPA and CCHS Falters**

**1. Lipson and ASPA Disagree on ASPA's Business Plan and Personnel Issues**

Lipson came to ASPA from Yale/New Haven and New London Hospitals in Connecticut where he was the Director of the Intensive Care Units. Prior to his arrival, Lipson expressed to ASPA his desire to develop a critical care medicine component to ASPA's hospital-based anaesthesiology practice. His plans initially were endorsed by ASPA's upper management. Over time, however, Lipson began to sense that his ASPA partners were reluctant to allow him to develop this sub-specialty at CCHS.[5] According to Lipson, ASPA's opposition to his plan to expand the practice to include critical care medicine was based primarily on the partners' perception that health insurance carriers pay less for critical care services than for surgical services. According to Lipson, it is a generally known fact that anaesthesiologists engaged in critical care medicine perform

more work than their colleagues working in the operating room but receive less pay. (D.I.21, Int. 2)

Lipson alleges that eventually Bruce Wales, M.D. ("Wales"), the President of ASPA, advised him that if he wished to practice critical care medicine "he should consider leaving the group." (D.I. 21, Int. 2 at 2) Nevertheless, Lipson continued his efforts to convince CCHS to incorporate anaesthesiology in its Critical Care Medicine service and to allow him to develop this component of the service.

Lipson also began to speak out against what he perceived to be unfair treatment of the non-partner physicians by ASPA. According to Lipson, his partners believed that he was the architect (if not author) of a letter from "non-partnered members" of ASPA to the ASPA partners in which several concerns were raised including the disparity in salaries between partners and non-partners. (D.I. 21, Int. 2 at 38–39) While the letter ultimately resulted in an improved working relationship between partners and non-partners, Lipson believes that his partners believed he was the instigator of the non-partners' demands and that this belief was the source of much animosity directed towards him by his partners.

Lipson alleges that he also openly supported higher salaries and better working conditions for ASPA's CRNAs. This effort likewise was not well received by ASPA partners. During the course of the discussions regarding the CRNAs, Lipson raised questions about whether ASPA physicians were spending enough time at the

---

4. Critical Care Medicine, as best as the Court can discern, involves post-surgical care of critically ill patients, typically in the setting of an intensive care unit.

5. For instance, Lipson perceived that his ASPA partners were blocking his efforts to

attract qualified critical care anaesthesiologists to join ASPA by treating them poorly when they would interview for positions and by expressing to potential candidates less than genuine enthusiasm for Lipson's plan to develop a critical care practice. (D.I. 21, Int. 2)

hospital and whether physicians were delegating too many responsibilities to CRNAs. Lipson couched these questions as concerns for patient safety. His partners were not pleased.

### 2. ASPA Investigates Lipson's Professional Behavior

The relationship between Lipson and ASPA deteriorated further in the early months of 1999. On March 11, 1999, while Lipson was the "on-call" anesthesiologist at Christiana Hospital, he was called to respond to an incoming trauma patient. Along with another doctor, Lipson transported the patient directly to an operating room. During the transport, and after the patient was in the operating room, Lipson was heard using offensive language. Lipson also allegedly breached hospital protocols by admitting the patient directly to the operating room, thereby bypassing the admission protocol of the emergency room. The failure to admit the patient through the emergency room, *inter alia,* prevented attendants from immediately placing an identification band on the patient.[6] (D.I. 24, Ex. B, Attach. 12 at 2)

Lipson's actions on March 11, 1999, generated numerous complaints from those present. The complaints ranged from general complaints of offensive behavior to more specific complaints that he failed to observe proper admission procedures and thereby jeopardized patient safety.

On the evening of March 31, 1999, Lipson again displayed questionable behavior. While "on-call" at Christiana Hospital, he responded to an emergency page for an anesthesiologist. When Lipson returned the page, the operator was unable to inform him of the nature or location of the emergency. Aware that he was needed on an emergent basis, and apparently frustrated that the operator could not direct him to the emergency, Lipson, in an angry tone, began to shout out profanities, although it is not clear to whom, if anyone, these comments were directed. This incident also led to complaints about Lipson's behavior. (D.I. 24, Ex. B, Attach 13)

Fagraeus briefly described the two incidents in a letter dated April 5, 1999, addressed to Lipson. The letter was written on CCHS letterhead and was signed by Fagraeus as "Chairman [of the] Department of Anesthesiology." Fagraeus concluded the letter with an admonition: "In summary, your behavior cannot be tolerated any more. By copy of this letter I am informing Dr. Wales of my concerns and suggesting that [ASPA] consider appropriate action." (D.I.24, Ex. B, Attach.5)

Lipson confirmed the incidents of unprofessional behavior during a subsequent telephone conversation with Wales. According to Wales, Lipson then was invited to attend the regularly scheduled ASPA board of directors' meeting on April 14, 1999 to discuss the incidents. (D.I. 24, Ex. B at 5) Lipson denies that he was invited to attend the meeting and, indeed, he maintains that he "was not permitted to attend." (D.I. 21, Int. 16) The board meeting took place as scheduled on April 14th; Lipson did not attend. At the meeting, Wales read the April 5th Fagraeus letter and recommended that the board respond to Fagraeus' call for action. The board decided on the following course of corrective action: (1) ASPA would require Lipson to undergo a psychological/psychiatric evaluation;[7] (2) ASPA would receive the

---

6. The failure to secure an identification band for the patient purportedly placed the patient at risk for mistaken medical procedures caused by confusion of identification.

7. ASPA apparently was concerned that certain stressors in Lipson's personal life may be the source of his unusual behavior at the hospital. Lipson was evaluated on May 10,

results of that evaluation and respond accordingly; (3) Lipson would be suspended from ASPA's board of directors; (4) Lipson would be "removed from all call obligations [at Christiana Hospital] immediately except C4 and W3 calls[8] ..."; and (5) Lipson would be prevented from working on the "ICU [Critical Care Medicine] project." (D.I. 24, Ex. B, Attach. 8) On April 15, Wales sent an e-mail to all ASPA doctors and CRNAs stating, in part: "[d]ue to medical reasons, Dr. Lipson will be leaving the call schedule for an indefinite period." (D.I. 24, Ex. B at 7 & Attach. 9)

The ASPA board held another meeting on May 12, 1999. After discussing Lipson's situation again, the board decided to advise Lipson informally, through his attorney, that it would recommend a one year suspension from ASPA's board. (D.I.24, Ex. B, Attach.16) The board met again on June 9, 1999, and modified its earlier decisions with respect to Lipson. Specifically, the board: reinstated Lipson to a "full call schedule" and decided that Lipson would have "regular meetings with the Department Chairman and members of the Human Resource Committee to assess progress." (D.I. 24, Ex. B, Attach. 17)

Lipson contends that after the two incidents at the hospital, his partners began a campaign to smear his reputation in the medical community. The comments purportedly involved either misstatements regarding his mental state—questioning whether he had or was having an emotional breakdown of some kind—or inaccurate recounting of the events at the hospital that gave rise to the complaints against Lipson—alleging, in essence, that Lipson

nearly had killed the child for whom he was caring on March 11, 1999.

### 3. Lipson Leaves ASPA

Lipson resigned from ASPA's board on July 15, 1999, and at the same time notified ASPA of his intent not to renew his employment contract. (D.I. 24, Ex. B, Attachs.21, 21) Lipson's letters to ASPA announcing these decisions, both dated July 15, 1999, were simple and direct: "I hereby submit my resignation from the Board of Directors of ASPA effective as of the date of termination of my employment." (D.I. 21, Ex. B, Attach. 21) "Pursuant to Paragraphs 2 and 12 of my Employment Contract with [ASPA], I hereby give notice of my intention not to renew my employment contract at the expiration of the current term." (D.I. 21, Ex. B, Attach. 22) Lipson did not provide a written explanation of his reasons for leaving the practice.

### 4. Lipson Forms ACCP and Attempts to Compete With ASPA

Less than two months after Lipson's resignation from ASPA, by letter dated August 27, 1999, Dr. Harold Rosen, Senior Vice President for Medical Affairs at CCHS, announced that CCHS's executive committee was instituting a six-month moratorium on the credentialing of physicians to the anesthesiology department. (D.I. 24, Ex. B, Attach. 27) The moratorium was intended to allow CCHS to "study the current modality by which anesthesia services are provided...." (*Id.*) Lipson believes that the true purpose of the moratorium was to prevent him from importing qualified anaesthesiologists to staff his to-be-formed medical practice. Without privileges to practice at CCHS, any physicians Lipson would be able to recruit to his new

---

1999, by Dr. Jay Amsterdam, a psychiatrist chosen by ASPA. The results of this examination have not been supplied to the Court.

8. The Court could find no explanation of "C4 and W3 calls" in the record.

anaesthesiology practice would be of no value to him.

Nevertheless, in January, 2000, Lipson returned to CCHS as a solo practitioner through his new medical practice, ACCP. At that time, Lipson was placed back on the call schedule at all CCHS facilities (ASPA still maintained full control over the schedule). Lipson's return to CCHS prompted several disputes with ASPA and CCHS. Not surprisingly, these disputes principally involved Lipson's complaint that ASPA and, to a lesser extent, CCHS were scheduling him less frequently and for less attractive assignments. The parties also disagreed over the manner by which ASPA responded to special requests for Lipson's services from physicians and patients. Lipson complained that these scheduling difficulties were delaying the opening of his practice. (D.I. 29, Ex. C)

According to ASPA, Lipson began to solicit non-partner physicians and CRNAs from ASPA to join his practice. Indeed, ASPA contends that Lipson would enter operating rooms in the midst of surgery to discuss job offers with ASPA physicians and CRNAs. (D.I. 24, Ex. B at 15–16, Attach. 37) Lipson, of course, denies that he improperly recruited ASPA employees. He also contends that the slanderous comments from his partners continued after he left the practice, particularly in the context of ASPA's efforts to dissuade its employees from talking to Lipson about employment. (D.I. 21, Int. 25) The dispute between the parties soon disrupted the hospital (particularly the department of anaesthesiology) considerably. (D.I. 24, Ex. B)

In May 2000, CCHS announced a request for proposal for an exclusive anesthesia services contract for its hospital campuses and surgicenters. ASPA and ACCP submitted proposals. In October 2000, an *ad hoc* committee which was formed to review the proposals advised ASPA that CCHS was considering whether to award two contracts for anesthesia services within its system. On November 8, 2000, however, the *ad hoc* committee announced that it would award an exclusive contract to ASPA. ASPA surmises that CCHS, informed by past experience, determined that providing contracts to competing anaesthesia practices would be too disruptive because the practices inevitably would disagree over case assignments and coverage. To date, the contact has not been executed. (D.I. 24, Ex. B at 12–14)

In August 2001, Lipson accepted a position at the University of Pennsylvania as Associate Clinical Professor of Anesthesia where he will teach at the medical school and practice full-time in anaesthesiology and critical care medicine at the hospital there.

## III. DISCUSSION

### A. The Parties' Contentions

Lipson alleges that his former partners' unfounded attacks upon his professional competence constituted actionable libel and slander. He also contends that ASPA interfered with his contractual relationship with CCHS by causing the hospital to restrict his privileges to practice there. He further alleges that ASPA then engaged in a course of conduct that interfered with ACCP's prospective business relations with certified registered nurse anesthetists who wished to join ACCP and with surgeons who sought to refer patients to ACCP. These factual contentions predicate a five count complaint: (1) intentional interference with contractual and prospective contractual relations, (2) breach of contract, (3) constructive termination, (4) unfair trade practices, and (5) libel and slander.

ASPA has filed a Motion for Summary Judgment on all counts. The showcase argument in support of the motion is that Plaintiffs' claims fail as a matter of law because ASPA was engaged in peer review of Lipson's conduct on behalf of CCHS at the time of the events described in Plaintiffs' complaint and, therefore, the practice is immune from suit. ASPA also argues that Plaintiffs have failed to carry their burden to establish defamatory statements and, in any event, their statements regarding Lipson's deficient care are protected by a qualified privilege. Finally, ASPA maintains that Plaintiffs have failed to identify with requisite specificity the contracts or business relations with which ASPA interfered. Plaintiffs counter by arguing that material issues of fact permeate the limited record developed thus far and, consequently, summary judgment is not appropriate.

### B. Summary Judgment Standard

Summary judgment may be granted only when the Court's review of the record reveals that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.[9] The moving party bears the initial burden of demonstrating that the undisputed facts do not support plaintiff's legal claims or that such claims are not viable as a matter of law.[10] If the motion is properly supported, the burden shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the fact-finder.[11] When reviewing the record, the Court must view the evidence in the light most favorable to the non-moving party.[12]

### C. Peer Review Immunity

#### 1. The Federal Peer Review Statute

ASPA contends that it is immune from a suit for damages by virtue of the Health Care Quality Improvement Act of 1986, 42 *U.S.C.* §§ 11101–1152 ("HCQIA"). Congress enacted the HCQIA with the intent to "improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior." '[13] The principle means by which the HCQIA encourages physicians and other health care providers to embrace this policing responsibility is to limit[14] the threat of litigation for qualified health care providers who participate in peer review activities.[15] When determining whether ASPA

9. *Dale v. Town of Elsmere*, Del.Supr., 702 A.2d 1219, 1221 (1997).

10. *Moore v. Sizemore*, Del.Supr., 405 A.2d 679, 680 (1979)(citing *Ebersole v. Lowengrub*, Del.Supr., 180 A.2d 467 (1962)).

11. *Brzoska v. Olson*, Del.Supr., 668 A.2d 1355, 1364 (1995).

12. *See United Vanguard Fund, Inc. v. Takecare, Inc.*, Del.Supr., 693 A.2d 1076, 1079 (1997); *Brzoska*, 668 A.2d at 1364.

13. *Brader v. Allegheny Gen. Hosp.*, 3d Cir., 167 F.3d 832, 839 (1999)(quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6287, 6384).

14. The HCQIA immunizes designated health care providers from claims for money damages only as opposed to claims for injunctive relief or other equitable (or legal) non-monetary remedies. *See* 42 U.S.C. §§ 11101(4), 11111(a); *Pamintuan v. Nanticoke Memorial Hosp., Inc.*, D. Del., C.A. No. 96–233–SLR, 1997 WL 129338, Robinson, J., at *35 (Feb. 24, 1997). In this case, however, the immunity provided by the HCQIA would blunt all of plaintiffs' claims. The relief sought is limited to money damages; plaintiffs do not seek reinstatement or equitable relief in their pleadings.

15. *See Brader*, 167 F.3d at 839. *See also* 42 U.S.C. § 11111(a)(1) ("If a professional review action ... of a professional review body meets all the standards specified in section 11112(a) of this title" then the participants "shall not be liable in damages under any law

enjoys the immunity set forth in the HCQIA, then, the Court must focus its inquiry on two issues: (i) was ASPA acting as a protected "professional review body" when it investigated the complaints regarding Lipson's conduct; and (ii) was ASPA engaged in protected "professional review action" during the events giving rise to plaintiffs' complaint? Plaintiffs bear the burden of establishing that ASPA is not entitled to immunity under the statute and, in this regard, the burden on summary judgment is transferred at the outset of the analysis to the non-moving party.[16]

### a. ASPA Was Not Acting as a Professional Review Body

 The HCQIA does not codify a blanket immunity for any person or entity engaged in "peer review" activity. Rather, Congress specifically identified those persons or entities to which the immunity provisions apply. Specifically, immunity under the HCQIA extends only to: "[a] professional review body,[17] any person acting as a member or staff to the body, any person under a contract or other formal agreement with the body, and any person who participates with or assists the body with respect to the action...."[18] Although written decisions addressing the extent to which the HCQIA immunity will reach peer review activity outside of a hospital setting apparently are scarce (the parties have not directed the Court to any authority on the issue), the statutory language itself suggests that an entity such as ASPA may be entitled to immunity, either in the context of peer review functions performed on behalf of a hospital or possibly even in the context of peer review functions performed on its own initiative. Arguably, if ASPA could establish that it provides health care services (which clearly it does) and that it "follows a formal peer review process," its governing body would qualify as a "professional review body" when engaged in "professional review action," even if such peer review was conducted within its own organization relating to providers within the practice.[19]

ASPA has narrowed the issue, however, by conceding in its papers[20] and at oral argument that the investigation of Lipson was not an investigation initiated by ASPA for ASPA. Rather, ASPA contends that it conducted the investigation of Lipson and implemented correction action against Lipson at the request of the Chairman of the Department of Anesthesia on behalf of CCHS. If the record supported ASPA's contention, the Court easily would con-

---

of the United States or of any State (or political subdivision thereof) with respect to the action").

**16.** *Pamintuan v. Nanticoke Memorial Hosp.,* 3d Cir., 192 F.3d 378, 388 (1999); *Brader v. Allegheny General Hospital,* 3d Cir., 64 F.3d 869, 879 (1995).

**17.** "The term 'professional review body' means a health care entity and the governing body or committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." 42 U.S.C. § 11151(11). A "health care entity" includes hospitals, an entity (including

a HMO or "group medical practice") which follows a formal peer review process, or a professional society of licensed health care providers. 42 U.S.C. § 11151(4)(A).

**18.** 42 U.S.C. § 11111(a)(1). *See also* 42 U.S.C. § 11111(a)(2), specifically setting forth "[p]rotection for those providing information to professional review bodies[.]"

**19.** *See* 42 U.S.C. §§ 11151(4)(ii) & (11)(a "group medical practice" or other entity which provides health care services can qualify as a "professional review body," but only if it "follows a formal peer review process").

**20.** *E.g.* (D.I. 44 at 3; D.I. 60 at 2).

clude that ASPA was a "professional review body" which, if engaged in "professional review action," would enjoy HCQIA immunity. But the record does not support ASPA's contention. While it is true that Fagraeus suggested that ASPA consider taking some action against Lipson, he in no way suggested that such action should be taken on behalf of the hospital.[21] And he certainly made no effort to invoke CCHS's extensive peer review machinery in connection with the complaints he received about Lipson.[22] Nor has ASPA presented any evidence that it determined to follow a formal corrective action plan on its own that resembled even slightly the plan followed by CCHS for its staff physicians. Inviting Lipson to attend a regularly scheduled board meeting was a flaccid substitute for a fair hearing.

Relying upon the HCQIA's definitions of "professional review action" and "professional review activity," ASPA has attempted to craft an argument that informal peer review activity will qualify for immunity.[23] Specifically, citing *Brader*,[24] ASPA contends that protected peer review can occur even though a formal, "time-consuming" proceeding is not initiated. Indeed, ASPA may well be correct that "professional review activity" need not involve formal proceedings for immunity to attach. But ASPA begs the question of whether it can characterize its activities as "professional review activit[ies]" when it cannot meet the HCQIA's definition of a "professional review body" or "health care entity." On the record presented here, ASPA meets neither definition. Consequently, its effort to side-step CCHS's peer review process and to minimize its own failure to initiate a formal peer review process will not be countenanced.

### b. ASPA Did Not Engage in Professional Review Action or Activity

■ As a matter of statutory deduction, because ASPA acted as neither a "professional review body" nor a "health care entity" when it investigated and then disciplined Lipson, it cannot be said to have been engaged in "professional review action" or "professional review activity."[25] The inquiry easily could end here. Nevertheless, even assuming *arguendo* that ASPA was acting as a "professional review body" or a "health care entity," or both, it still can not credibly maintain that its actions with respect to Lipson constituted peer review activity.

The Court has been presented with compelling evidence that ASPA employed no peer review process at all. Lipson has presented a sworn affidavit detailing the formal and established peer review process employed by CCHS (Lipson served on CCHS's Peer Review Committee of its

---

21. *See* (D.I. 24, Ex. B, Attach. 5)(Fagraeus states "By copy of this letter I am informing Dr. Wales of my concerns and *suggesting* that *ASPA* consider appropriate action") (emphasis supplied). Fagraeus says nothing of CCHS's Corrective Action/Fair Hearing Plan, nor does he even *direct* that an investigation take place. Instead, he simply *suggests* that ASPA *consider* taking some action, be it corrective or otherwise. Fagraeus' letter hardly can be characterized as the initiation of peer review activities on behalf of CCHS as ASPA would have the Court believe.

22. *See* (D.I. 29, Ex. A at 18)(Article V of CCHS's By–Laws outlines a detailed corrective action plan which includes fair hearing procedures and appeal rights).

23. *See* 42 *U.S.C.* §§ 11151(9) & (10).

24. *Brader*, 167 F.3d at 842.

25. *See* 42 *U.S.C.* § 11151(9)("professional review action" encompasses actions taken by a "professional review body"); 42 *U.S.C.* § 11151(10)("professional review activity" encompasses actions taken by a "health care entity").

Anesthesiology Department). (D.I. 52 at 2) Anesthesiology Department policy requires that when taking disciplinary action, Fagraeus, as the department chairman, must be guided by the due process protections codified in CCHS's bylaws. (D.I. 29, Ex. A at 18–21 & Ex. B) These protections provide that in the event of a summary suspension, Fagraeus must refer the matter to CCHS's credentialing committee. (*Id.* at Ex. B) ASPA's argument that it didn't feel the need to pursue such formal and "time-consuming" measures misses the mark.

The CCHS bylaws shine even more light on ASPA's inadequate process. The act of removing Lipson from the call schedule and otherwise limiting his ability to practice anesthesiology can be viewed as nothing less than some sort of "corrective action" under the bylaws (although that term is not defined). The bylaws, at Article V, § 1(B), set forth the "Process for Corrective Action":

> The events suggesting the need for corrective/remedial action shall be reported in writing to the departmental chairperson and be considered in the peer review system. The report must be supported by reference to the specific clinical activities or conduct, which constitutes the grounds for the report. The activities or conduct will be investigated through the departmental and Staff peer review process and is reported to Staff Council for appropriate action. (D.I. 24, Ex. B, Attach. 2 at 20)

Wales' Affidavit does not even attempt to establish compliance with this provision. Although an argument could have been constructed that Wales himself was conducting the investigation and that its results were intended to be reported to the "Staff Council" at some point after ASPA

took corrective action against Lipson, ASPA wisely declined to stretch the record so thin.

Based on the foregoing, the Court has concluded that Lipson has satisfied his burden to establish that ASPA was not engaged in peer review activity under the HCQIA because it was not acting as a "professional review body." By failing to follow CCHS's Corrective Action/Fair Hearing Plan, and in the absence of any internal "formal peer review" process to guide their investigation, ASPA's conduct—at least in the eyes of the HCQIA—was nothing more than employee discipline, cloaked with no more protection or immunity from suit than any other personnel decision it may have made. Accordingly, ASPA's motion for summary judgment on the ground of immunity under the HCQIA is **DENIED**.

### D. Delaware's Peer Review Statute

ASPA has argued that Delaware's Peer Review statute, entitled "Immunity of Boards of Review; Confidentiality of Review Board Records"[26] (the "Act"), provides an independent basis for peer review immunity notwithstanding the protections, or lack thereof, provided by the HCQIA. The Act applies to:

> The Board of Medical Practice, the Medical Society of Delaware, their members, or the members of any committees appointed thereby or the members of any committee appointed by a certified health maintenance organization, and members of hospital and osteopathic medical society committees, or of a professional standards review organization established under federal law (or other peer review committee or organization), whose function is the review of medical records, medical care and physicians'

---

**26.** 24 *Del. C.* § 1768

work, with a view to the quality of care and utilization of hospital or nursing home facilities, home visits and office visits....

The immunity provided by the Act is broader than the immunity provided by the HCQIA in that immunity under the Act extends beyond claims for damages.

[Qualified persons or entities] shall not be subject to, and shall be immune from, claim, suit liability, damages or any other recourse, civil or criminal, arising from any act or proceeding, decision or determination undertaken or performed or recommendation made so long as such member acted in good faith and without malice in carrying out the responsibilities, authority, duties, powers and privileges of the offices conferred by law upon them under this chapter ... or any other provisions of the Delaware law, federal law or regulations, or duly adopted rules and regulations of the aforementioned committees, organizations and hospitals, good faith being presumed until proven otherwise, with malice required to be shown by the complainant.[27]

The case law interpreting the immunity provisions of the Act focuses mainly on the requirement that peer review committees conduct their activities in good faith, or the extent to which the Act protects documents generated during peer review from discovery.[28] The Court is not aware of any precedent directly addressing whether, or

to what extent, the Act provides immunity for alleged peer review activity conducted by a private medical practice like ASPA, even if such peer review is conducted at the request of a hospital.

■ Although the case law is silent on the issue, the Act itself does suggest that a private medical practice could engage in protected peer review activity. First, the Act provides that immunity is available not only to traditional hospital-based or professional or regulatory organizations, but also to "other peer review committee[s] or organization[s]."[29] With respect to the work of the committee, the Act not only addresses the review of medical care delivered in hospitals and nursing homes, it also addresses "peer review" of care delivered in the course of "home visits (presumably referring to home health care agencies) and *office visits.*"[30] (emphasis supplied) The Court can appreciate no justification—either in the text of the Act or its purpose[31]—to deny access to the Act's protections to private medical practices which otherwise comply with the letter and spirit of the Act. Accordingly, the Court declines to invoke such a restricted reading of the Act here.

The Court has concluded that ASPA was not acting on behalf of CHHS at the time it addressed Fagraeus' concerns about Lipson. Nevertheless, the Court has determined that immunity under the Act is available to ASPA to the extent it acted in accordance with the Act's provisions. In

---

27. 24 *Del. C.* § 1768(a).

28. *E.g. Dworkin v. St. Francis Hosp.,* Del.Super., 517 A.2d 302 (1986)(peer review must be conducted in a manner consistent with principles of fairness); *Danklef v. Wilmington Medical Center,* Del.Super., 429 A.2d 509 (1981)(records generated during peer review are confidential).

29. 24 *Del. C.* § 1768(a).

30. *Id.*

31. "Title 24, Section 1768 of the Delaware Code is intended to encourage frank and open discussions of a physician's qualifications and performance by medical peer review committees." *Riggs National Bank v. Boyd,* Del.Super., C.A. No. 96C–05–122, 2000 WL 303308, Quillen, J. (Feb. 23, 2000)(Letter Op. at 9) (citation omitted).

this regard, the Court has two concerns. First, the Court is unable to determine by what standard Lipson's conduct was considered. Second, the Court is unable to determine by what process ASPA conducted its review of Lipson. Both issues will be addressed *seriatim.*

With respect to the Court's first concern, *Sweede v. Cigna Healthplan of Delaware, Inc.*[32] provides appreciable, albeit general, guidance. In *Sweede,* the Court considered whether records generated by a health maintenance organization's quality assurance committee should be protected from discovery under § 1768(b).[33] The Court's conclusion that the committee was engaged in protected peer review activity was based, in part, upon the conclusion that the committee was working with established procedures that outlined the type of evidence it would consider and the standards by which the physician's care would be reviewed.[34] The Court reasoned that extending immunity to the committee's activities was consistent with the general legislative purpose underlying the Act: to "establish[ ] and enforce[ ] professional standards...."[35]

With this stated purpose of the Act as a backdrop, the Court cannot discern, in this case, how ASPA's conduct is consistent with or in furtherance of "the Legislature's goal of creating an environment for the establishment and enforcement of professional standards."[36] Although ASPA effectively limited Lipson's ability to practice medicine under its name, its authority could not reach issues of credentialing or licensing.[37] Moreover, no evidence has been supplied to the Court that demonstrates that ASPA even considered, much less actively enforced, professional standards in relation to Lipson. The ASPA board did not rely upon or point to any established medical standard by which Lipson's conduct was examined in support of its decision to suspend him from the call schedule.

ASPA's failure to measure Lipson's conduct against established (or, at least, identified) professional standards, while troubling, is perhaps not dispositive of the immunity issue. The failure to conduct its "peer review process" in accordance with established procedures or protocols, however, removes ASPA from under the umbrella of the Act's peer review immunity. The Act clearly contemplates such formal procedures as well as clearly defined responsibilities conferred upon a formal peer review committee or organization. It grants immunity to committee members who "act[ ] in good faith without malice in carrying out the responsibilities, authorities, duties, powers and privileges of the offices conferred by ... duly adopted rules and regulations of the aforementioned committees...."[38] The Act provides no protection for members of a medical prac-

---

**32.** Del.Super., C.A. No. 87C–SE–171–1–CV, 1989 WL 5194, Del Pesco, J. (Jan. 12, 1989)(Order). *See also Hagadorn v. Davidson,* Del.Super., C.A. No. 88C–MY–116, 1990 WL 18274, Stiftel, P.J. (Feb. 12, 1990)(Letter Op.)(same).

**33.** *Sweede, supra,* Order at *2.

**34.** *Id.*

**35.** *Id. See also, Riggs National Bank v. Boyd,* Del.Super., C.A. No. 96C–05–122, Quillen, J. (Feb. 23, 2000)(Letter Op.)(same); *Quinn v.*

*Kent Gen. Hosp., Inc.,* D. Del., 617 F.Supp. 1226, 1234 (1985)(same); *Danklef,* 429 A.2d at 513.

**36.** *Dworkin,* 517 A.2d at 304 (citing *Danklef v. Wilmington Medical Center,* Del.Super., 429 A.2d 509, 513 (1981)).

**37.** This fact also undermines ASPA's argument that it was conducting peer review of Lipson on behalf of CHHS.

**38.** 24 *Del. C.* § 1768(a).

tice (or other health care entity) who take steps to discipline a rogue care provider outside of a clearly defined peer review process, even if the ultimate goals of such action are the enforcement of professional standards and patient safety.[39]

The record indicates that ASPA considered Lipson's conduct on an *ad hoc* basis at a regularly scheduled meeting of its board of directors. No process attached to the "peer review" aspects of the meeting, *e.g.*, there was no formal notice of the meeting or a meeting agenda provided to Lipson, no explanation of the process to be followed by the board when considering Lipson's behavior, no explanation of possible corrective action to be taken by the board, and no explanation of Lipson's rights during the process. Whether part of a permanent document such as the practice's bylaws or a handbook of some kind, or a temporary document such as one prepared in advance of a particular peer review effort, or an oral explanation to the participants, some process must be implemented by the peer review committee to ensure that the Act's mandate of good faith and fairness is preserved.[40] No such process was followed here.[41]

ASPA's Motion for Summary Judgment is **DENIED** in so far as it relies upon the peer review immunity afforded by the Act.

## E. Breach of Contract

■ Lipson's breach of contract claim is based on simple allegations; Lipson's "[e]mployment [c]ontract ... provided that a unanimous vote of the [b]oard of [d]irectors was necessary to suspend Dr. Lipson from any duties or services." (D.I. 1 at ¶ 23) The complaint then alleges that "[t]he ... suspen[sion of] Dr. Lipson ... was made without unanimous vote of the [b]oard of [d]irectors or for any cause and, therefore, was in breach of the [c]ontract." (*Id.* at 24)

In its Motion for Summary Judgment, ASPA has supplied unrebutted evidence (Wales' Affidavit) that "by unanimous vote, the [b]oard ... removed [Lipson] from all call obligations ... [and] suspended [him] as a member of the [b]oard of [d]irectors...." (D.I. 24, Ex. B at 6–7) ASPA acknowledges, however, that only twelve of the sixteen members of ASPA's board of directors were present at the April 14, 1999, board meeting. (Defen-

---

**39.** *See Dworkin*, 517 A.2d at 306–07 (decision to terminate physician's privileges for alleged incompetence in a manner inconsistent with hospital bylaws not protected by the Act's immunity); *Timblin v. Kent General Hosp.*, Del.Super., C.A. No. 90C–MR–122, 1995 WL 214379, Quillen, J. (April 3, 1995)(Letter Op.)("routine individual 'performance appraisal'" prepared outside of the formal peer review process not protected from discovery under the Act).

**40.** The quality of the process and the manner in which the process is communicated is not spelled out in the Act and must, therefore, be addressed by the Court on a case-by-case basis to the extent immunity under the Act is at issue.

**41.** Once again, the Court feels compelled to distinguish *Brader*, the principal decision upon which ASPA relies to support the propo-

sition that peer review need not be a formal process in order for those who participate in it to enjoy immunity. *See Brader*, 167 F.3d at 842. Most obvious by way of distinction, of course, is the fact that *Brader* was decided under the HCQIA, not Delaware's counterpart. More importantly, the Court does not read *Brader* to dispense with the requirement of process. Rather, *Brader* held that not *all* aspects of the peer review committee's investigation must be in accord with a formal process. Nevertheless, the Court in *Brader* was not confronted with a case where alleged peer review was conducted in the absence of any process whatsoever. Indeed, the peer review process initiated to review Dr. Brader's professional competence did follow specific guidelines set forth in the Alleghany General Hospital medical staff bylaws. *Id.* at 836–38.

dant's. Post–Hr'g Submission at 11) All members present voted to take the corrective action against Lipson which was later implemented by Wales' letter to Lipson of April 20, 1999. (D.I. 24, Ex. B, Attach. 10)

Plaintiffs contend that "[t]he vote was not a unanimous vote of the board because in addition to Dr. Lipson, three other directors, Drs. Fagraeus, Tolpin and Abello, did not attend and, therefore, did not vote." (D.I. 29 at 4) Plaintiffs note that the minutes of the April 14, 1999, board meeting reflect their absence. (*See* D.I. 24, Ex. B, Attachs. 8, 15) These facts are not disputed.

Judge Learned Hand once observed: "[t]here is no surer way to misread any document than to read it literally." [42] Needless to say, the Court does not recite Judge Hand's apt observation as a means to undermine this Court's obligation to interpret a contract in keeping with the "plain meaning" of its terms. [43] Rather, the point to be made is that, when interpreting a contract, the "literal" meaning of a term is not always consistent with the "plain" meaning. This is such a case.

 Lipson's employment contract with ASPA, the operative document here, does not define "unanimous." One additional provision in the employment contract, however, does guide the Court in its search for the "plain meaning" of "unanimous": *"Incorporation by Reference.* Employee hereby agrees that [ASPA's] certificate of incorporation and bylaws together with all currently effective rules, regulations and resolutions made thereunder, are hereby included in this Contract and made a part hereof." (D.I. 29, Ex. D at ¶ 14) "Where a contract is executed which refers to another instrument and makes the conditions of such other instrument a part of it, the two will be interpreted together as the agreement of the parties." [44]

According to ASPA's Bylaws: "[a] majority of the total number of directors shall constitute a quorum for the transaction of business...." (D.I. 24, Ex. B, Attach. 1, § 6) The bylaws then explain: "the vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the board of directors." (*Id.*) The undisputed facts fall in line with these provisions. There were twelve of sixteen ASPA directors present at the board meeting where Lipson's authorization to work was removed. Under the bylaw's definition of a "quorum," this clearly was "[a] majority of the total number of directors...." Because a quorum was present at the directors' meeting, the directors present at that meeting were capable of acting for the practice as the entire board would be. All twelve directors affirmatively voted for the action; thus, the action was taken by "unanimous" vote and in compliance with the voting provisions of the employment contract and bylaws. [45]

---

42. *Guiseppi v. Walling*, 2d Cir., 144 F.2d 608, 624 (1944), aff'd sub nom, *Gemsco v. Walling*, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945).

43. *Phillips Home Builders, Inc. v. Travelers Ins. Co.*, Del.Supr., 700 A.2d 127, 129 (1997)("[I]f the relevant contract language is clear and unambiguous, courts must give the language its plain meaning")(citing *Playtex FP, Inc. v. Columbia Cas. Co.*, Del.Supr., 622 A.2d 1074, 1076 (1992)).

44. *State v. Black*, Del.Super., 83 A.2d 678, 681 (1951). *See also Realty Growth Investors v. Council of Unit Owners*, Del.Supr., 453 A.2d 450, 454 (1982)("A contract can be created by reference to the terms of another instrument if a reading of all documents together gives evidence of the parties' intention and the other terms are clearly identified.") (citations omitted).

45. [U]nanimous is defined as "[a]greeing in opinion; being in complete accord ... [and a]rrived at by the consent of all...." Black's Law Dictionary at 1525 (7th ed.1999).

■ This determination, however, does not touch upon whether the suspension complied with the contractual requirement that the board of directors form "the opinion [that] … the employee [has] failed to provide or will likely fail to provide, either generally or in any specific instance, that degree of professional anesthesia services which constitute acceptable medical practice." (D.I. 29, Ex. D, ¶ 16) Lipson complains that "there were never any departmental or hospital charges or investigations directed toward [him] and, therefore, no valid basis for any suspension." (D.I. 1 at ¶¶ 22–24) ASPA has not addressed specifically this aspect of the complaint in its motion. Nevertheless, the Court is satisfied that the record submitted supplies a foundation of undisputed factual evidence upon which the Court can base a ruling that ASPA is entitled to judgment as a matter of law.

Neither ASPA's bylaws nor Lipson's employment agreement require that the board's decision temporarily to suspend Lipson be prompted by any hospital or departmental action. Instead, the employment agreement simply requires that the board reach an "opinion" that Lipson, *inter alia,* "failed to provide … that degree of professional anesthesia services which constitute acceptable medical practice." (D.I.29, Ex. D, ¶ 16) The process by which this "opinion" is reached, and the information upon which the board shall rely, is stated nowhere in the contract.

The minutes from the April 14, 1999 director's meeting reveal that the directors considered: (1) Fagraeus' letter of April 5, 1999 discussing the incidents of inappropriate behavior; (2) Fagraeus' request that Anesthesia Services' take "appropriate action" in response to the incidents; (3) the description of the events provided by Wales (including his account of discussions with other interested parties); and (4) discussion concerning the selection of an appropriate doctor to conduct a psychological evaluation of Lipson. (D.I.24, Ex. B, Attach.8) In Wales' April 20, 1999 letter to Lipson, in which he explains the decisions reached by the board on April 14 th, Wales states that Lipson's conduct in the course of providing professional anesthesia services at CCHS "jeopardized the health and safety of a young child." (D.I.24, Ex. 2, Attach.10) Right or wrong, this statement represented the unanimous opinion of the ASPA board. The decision temporarily to suspend Lipson was then within the board's discretion, a province expressly (and plainly) granted the board by the contract.[46]

■ As an additional ground for denying the Motion, Plaintiffs have presented evidence indicating that the board's action was motivated by factors unrelated to the two incidents of inappropriate conduct. According to Lipson, ASPA's actions against him took place one week after he lodged a grievance against two other ASPA partners. In this grievance, Lipson raised questions about the quality of care a patient received at a Surgicenter from these two anesthesiologists. Of particular significance, one of these doctors was Wales, a primary actor in the actions taken by ASPA against Lipson. (D.I. 55, at 4, 5 & Ex. D) On the basis of this connection and the close temporal proximity between the complaint and Lipson's suspension, Plaintiffs now make allegations of retaliation. Further, Lipson has indicated that "Dr. Golden told me that they wanted me off the [b]oard because they did not trust me with confidential information. Dr. Golden's letter of July 13, 1999 confirms [ASPA's] desire to remove me from the

46. *Phillips Home Builders, Inc.,* 700 A.2d at 129.

[b]oard because of confidentiality issues." (*Id.*)

Lipson's allegation of retaliation and subterfuge in the process that led to his suspension more appropriately would be pled as a breach of the implied covenant of good faith and fair dealing as opposed to a breach of an express contract, as pled in Count II of the complaint.[47] Plaintiffs have not pled a breach of the implied covenant of good faith and fair dealing and cannot raise the claim now in response to a motion for summary judgment.

■ Finally, Lipson has alleged that ASPA's removal of him from its board of directors violated his employment contract. (D.I. 1 at ¶ 11) The Court's review of the employment contract reveals that it in no way affects Lipson's relationship with ASPA's board of directors; the contract governs only his status as an employee. Without further support for the proclamation that dismissing Lipson from the board violated his employment contract, Plaintiffs' claim that a breach of contract has occurred must fail.

Based on the foregoing, ASPA's motion for summary judgment as to Count II of the complaint is **GRANTED**.

## F. Constructive Termination

■ Plaintiffs allege, under a Count styled "Constructive Termination," that actions taken by ASPA's board on April 14, 1999 and thereafter constituted "constructive wrongful termination." Specifically, Plaintiffs point to the following conditions in the workplace that forced Lipson to resign from the practice: (1) the suspension of Lipson from on-call activities at CCHS and the board of directors; (2) the demand that he undergo psychiatric evaluation prior to returning to on call duty "coupled with [ASPA's] refusal to obtain and pay for [such] report" once it was completed; and (3) "persisting harassment and slander by [ASPA's] members ..." (D.I. 1 at ¶ 26)

ASPA's motion for summary judgment with respect to the "constructive termination" claim is two-pronged: (1) the undisputed facts reveal that Lipson voluntarily resigned from ASPA; and (2) Delaware does not recognize "constructive discharge" as an independent cause of action.

The first prong of ASPA's argument can be disposed of summarily. Yes, Lipson resigned from ASPA.

■ Of course, the determination that Lipson resigned his employment does not end the inquiry; it is the first step of the inquiry. Constructive discharge claims assume that the employee was not terminated. They are predicated on the notion that an employer has made the work environment so intolerable as to leave the employee with no choice but to resign.[48] This is precisely what Lipson has alleged occurred in this case. The key question, then, is whether such conduct is actionable in Delaware.

Delaware has long recognized that an employee has a cause of action for wrongful termination.[49] ASPA does not dispute this indisputable state of Delaware's jurisprudence. Rather, it contends that an employee cannot bring a separate claim for "constructive termination" but instead

---

47. *See E.I. DuPont de Nemours and Co. v. Pressman*, Del.Supr., 679 A.2d 436, 449 (1996)(holding that "fictionalizing in a material way the employee's performance to cause dismissal, may be an actionable breach of the Covenant").

48. *Bali v. Christiana Care Health Services*, Del. Ch., C.A. No. 16433, 1998 WL 685380, Lamb, V.C. (Sept., 22, 1998)(Letter Op. at 10).

49. *Goldman v. Braunstein's, Inc.*, Del.Supr., 240 A.2d 577 (1968); *Carroll v. Cohen*, Del.Super., 91 A. 1001 (1914).

must weave the allegation of constructive discharge into a claim for "abusive discharge." [50] The argument amounts to nothing more than an exercise in semantics, and somewhat confusing semantics at that. To be clear, Delaware recognizes a cause of action for constructive discharge.[51] Calling it "constructive termination" or "abusive discharge" does not defeat the claim. Under the "constructive discharge" theory, the fact that Lipson voluntarily resigned from ASPA is not fatal to his claim for wrongful termination. Whether ASPA's conduct forced Lipson from the practice and whether it did so wrongfully are issues of fact for the jury to decide.[52] ASPA's motion for summary judgment as to Count III, therefore, is **DENIED.**

## G. Defamation

■ ASPA attacks Lipson's defamation claim on four fronts: (1) many of the statements about which Lipson complains were made as part of the peer review process; (2) "statements about Dr. Lipson's work performance are entitled to a conditional or qualified privilege"; (3) some statements are not attributable to ASPA; and (4) the statements are "merely personal slights but not actionable."

With respect to ASPA's first contention, the Court already has determined that peer review immunity is not available to ASPA or its board members. Consequently, statements made during the course of or arising out of the board's review of Lipson's conduct, if defamatory, are actionable.

■ ASPA's qualified privilege argument relies heavily upon the Wales affidavit. Specifically, Wales notes that: (i) the statements at issue referred to Lipson's character or qualifications; (ii) the persons involved in the communications shared a common interest in discussing Lipson's performance; and (iii) the persons involved in the communications had a legitimate reason for and interest in learning about that performance. (D.I. 44, citing D.I. 24, Ex. 2 at ¶¶ 11–32, 32–34) It is, of course, no coincidence that ASPA's argument tracks the elements of the applicable qualified privilege: "A qualified privilege 'extends to communications made between persons who have a common interest for the protection of which the allegedly defamatory statements are made.'" [53] "Additionally, the qualified

---

**50.** *See Beye v. Bureau of Nat'l Affairs,* Md. Ct. Spec.App., 59 Md.App. 642, 477 A.2d 1197, 1203 (1984).

**51.** *See Bali, supra,* Letter Op. at 10 ("The theory of constructive discharge recognizes 'that while an employer may not go so far as to actually and formally discharge an employee, he may nevertheless make conditions of continued employment so intolerable as to result in a constructive discharge.' "); *Thayer v. Tandy Corp.,* Del.Super., C.A. No. 85C–JA–89, Bifferato, J. (Apr. 29, 1987)(Mem.Op.); *Short v. Unemployment Ins. App. Bd.,* Del.Super., C.A. No. 84A–JL–13, Gebelein, J. (July 26, 1985).

**52.** ASPA contends that Lipson has acknowledged in prior sworn testimony and in written correspondence that he left ASPA voluntarily. The Court agrees with ASPA's

characterization of the evidence to which it has referred the Court in support of this contention. Nevertheless, Lipson has alleged in other sworn testimony that he was forced from the practice. The Court will leave this factual discrepancy where it belongs—in the hands of the jury. To resolve the controversy at this stage would require the Court to weigh conflicting evidence and to make credibility determinations, both of which are functions incompatible with summary judgment proceedings. *Bradley v. Regulatory Ins. Services, Inc.,* Del.Super., C.A. No. 97C–07–131, 1999 WL 459059, Toliver, J. (April 20, 1999)(ORDER at 5).

**53.** *Henry v. Del. Law Sch. of Widener Univ., Inc.,* Del. Ch., C.A. No. 8837, 1998 WL 15897, Lamb, V.C. (Jan. 8, 1998)(Mem. Op. at 22–23) (citations omitted).

privilege protects statements disclosed to any person who has a legitimate expectation in the subject matter."[54] "The question of whether or not a privilege attaches to a given communication is a question for the court to determine as a matter of law."[55]

Plaintiffs' response is three-fold. First, they contend that the existence of a conditional privilege and whether it was abused are fact questions. Second, they claim that ASPA is liable for statements republished by third parties where the original statement is attributable to ASPA. Lastly, Plaintiffs assure the Court that "the alleged defamation clearly maligns Dr. Lipson in his trade or profession."

The communications concerning Lipson fall into the following categories (as broken down by participants): Wales and Fagraeus; Lipson and Fagraeus; Fagraeus, Lipson and Wales; Wales and Lipson; Wales and Drs. Tinkoff and Hoelzer (both were present during the first incident of inappropriate behavior); Wales, Evelyn Ball and Vicki Nepi (witnesses to the incident with the paging operator); Wales and all ASPA doctors and medical staff; Wales and Dr. Amsterdam (who performed a psychiatric evaluation of Lipson at the request of ASPA); ASPA board of directors and other shareholders and employees; the board and various attorneys; and finally ASPA board members and Rosen (CCHS's senior vice president of medical affairs). (D.I. 24, Ex. B at ¶¶ 11–32, 34–35)

ASPA is correct that all of the participants in the discussions and correspondence noted in the categories delineated above did possess "a legitimate expectation in the subject matter."[56] All were either directors, shareholders, employees or agents of ASPA who would have an "expectation" (or interest) in Lipson's behavior as a representative of ASPA, or they were physicians involved in the CCHS community who would have an "expectation" in the quality of care and competency of a physician with whom they were expected to practice medicine. Delaware clearly recognizes "a qualified privilege of employers to make communications regarding the character, qualifications, or job performance of an employee or former employee to those who have a legitimate interest in such information."[57] ASPA's statements regarding Lipson's care of a patient or competency as a physician, therefore, are subject to a qualified privilege. The Court has made this determination as a matter of law.[58]

 Now that ASPA has established the protections of a qualified privi-

---

**54.** *Id.* at 23 (citing *Burr v. Atl. Aviation Corp.,* Del.Super., 332 A.2d 154, 155 (1974), *rev'd on other grounds,* Del.Supr., 348 A.2d 179 (1975)).

**55.** *Bickling v. Kent General Hosp.,* D. Del., 872 F.Supp. 1299, 1307–08 (1994) (citation omitted).

**56.** *Id.*

**57.** *Bloss v. Kershner,* Del.Super., C.A. No. 93C–040282 CHT, 2000 WL 303342, Alford, J. (Mar. 9, 2000)(Mem. Op. at 16)(citing *Stafford v. Air Prods. & Chems., Inc.,* Del.Super., C.A. No. 84C–JL–85, 1985 WL 189259, O'Hara, J.

(Sept. 5, 1985)(Letter Op.); *Burr,* 332 A.2d at 155). *See also Schuster v. DeRocili,* Del.Super., C.A. No. 99C–02–004, 2000 WL 1211504, Witham, J. (June 15, 2000)(Order at 9–13); *Durig v. Woodbridge Bd. of Educ.,* Del.Super., C.A. No. 90C–NO–22, 1992 WL 301983, Ridgely, P.J. (Oct. 9, 1992)(Mem. Op. at 13–14)("Delaware courts have recognized the conditional privilege is particularly relevant to communications made in employer/employee relationships.") (citations omitted); *Henry v. Univ. of Delaware,* Del. Ch., C.A. No. 8837, 1998 WL 15897, Lamb, V.C. (Jan. 8, 1998)(Mem. Op. at 22–23).

**58.** *See Bickling,* 872 F.Supp. at 1307–08.

lege, the Plaintiffs must carry "the burden to show an abuse of that privilege by producing evidence indicating *actual* malice on the part of defendant[ ]."[59] Plaintiffs' burden reflects an understanding in the law that a conditional privilege "'must be exercised with good faith, without malice and absent any knowledge of falsity or desire to cause harm.'"[60] Evidence of malice can be presented, for example, through incidents of excessive or improper publication or making statements known to be false.[61]

As the Court noted at the outset of this opinion, ASPA's motion for summary judgment was filed at a stage in the litigation when discovery had yet to be initiated in earnest. Consequently, the record presented to the Court is far from adequate to allow the Court to determine whether material factual disputes will exist with respect to the issue of actual malice. Accordingly, the Court is satisfied that it is "desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[62] For example, deposition testimony from the speakers that addresses the bases for and intent of their statements would be helpful.

Also, the Court should receive testimony from those individuals who allegedly heard defamatory statements, *e.g.*, (i) CRNA Deckoff who, according to Lipson, was told by an ASPA physician that "Dr. Lipson nearly killed a kid"; (ii) the CRNAs Lipson contends were told by ASPA physicians that their careers would be destroyed if they worked for ACCP; and (iii) the physicians outside of ASPA who were told that Lipson "had screwed up some trauma kid's case" and that Lipson was having a mental breakdown.[63]

■ "The question of whether a conditional privilege has been abused by malice or intent to harm ordinarily is a factual question for the jury ... unless, of course, the evidence when considered in a light most favorable to plaintiff is insufficient to raise a factual question upon which reasonable men might differ."[64] ASPA will be afforded an opportunity at the conclusion of discovery to demonstrate the absence of a material issue of fact with respect to actual malice in a renewed motion for summary judgment.[65] ASPA may also challenge the extent to which the statements are, in fact, defamatory and whether the statements can be attributed to ASPA.[66]

**59.** *Durig, supra,* Mem. Op. at 14 (emphasis in original) citing *Heller v. Dover Warehouse Market, Inc.,* Del.Super., 515 A.2d 178 (1986); *Battista v. Chrysler Corp.,* Del.Super., 454 A.2d 286, 291 (1982).

**60.** *Durig, supra,* Mem. Op. at 14 (quoting *Burr,* 348 A.2d at 181).

**61.** *See Battista,* 454 A.2d at 291.

**62.** *Guy v. Judicial Nominating Com'n,* Del.Super., 659 A.2d 777, 781 (1995).

**63.** Needless to say, this list of open factual issues is by no means exhaustive. It is offered for illustrative purpose only.

**64.** *Burr v. Atlantic Aviation Corp.,* Del.Supr., 348 A.2d 179, 181 (1975) (citations omitted).

**65.** *Cf. Henry,* supra, Mem. Op. at 25 (granting summary judgment on issue of abuse of qualified privilege after ten years had passed since the initiation of the litigation); *Schuster v. DeRocili,* Del.Super., C.A. No. 99C–02–004, 2000 WL 1211504, Witham, J. (June 15, 2000)(Mem. Op. at 12–13)("A bare allegation that an allegedly defamatory statement was made maliciously cannot survive [summary judgment]").

**66.** On October 1, 2001, the Court granted ASPA's motion to compel more complete responses to interrogatories which sought to bring some focus to Plaintiffs' defamation claim. It is the Court's expectation that these more specific and focused responses will aid the parties and the Court in the determination of which, if any, of the purportedly defamatory statements will survive summary judgment.

For now, ASPA's motion for summary judgment with respect to Count V is **DENIED**.

## H. Intentional Interference with Contractual and Prospective Contractual Relations

### 1. Interference with Contractual Relations

■ According to Plaintiffs' complaint, ASPA has, since July, 1999, "intentionally interfered with Dr. Lipson's and ACCP's contractual and prospective contractual relations with CRNAs, anesthesiologists, surgeons, hospital staff, patients and CCHS...." (D.I. 1 at ¶¶ 19–21) In order to sustain a claim of intentional interference with contractual relations, a plaintiff must establish the following elements: "(1) a contract (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." [67] Plaintiff has put forth no evidence to establish the existence of any specific contracts with those individuals or entities named in his complaint.[68] Accordingly, to the extent Plaintiffs have alleged intentional interference with existing contractual relations, ASPA's Motion for Summary Judgment is **GRANTED**.

### 2. Interference with Prospective Business Relations

Plaintiffs also allege intentional interference with prospective contractual or business relations.[69] In support of this claim, Plaintiffs have identified the following prospective business relations with which ASPA or those acting on behalf of ASPA have interfered: (i) prospective relations with surgeons and patients; (ii) prospective relations with CRNAs and physicians who might have come to work for ACCP; and (iii) prospective relations with CCHS. (D.I. 1 at ¶ 20) [70]

ASPA attacks Plaintiffs' tortious interference assertions on several fronts. First, it contends that Plaintiffs have failed to present sufficient facts to demonstrate the existence of prospective relationships.

---

67. *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, Del. Ch., 532 A.2d 983, 992 (1987) citing *Pennzoil Co. v. Getty Oil Co.*, Del. Ch., C.A. No. 7425, 1984 WL 15664, Brown, C. (Feb. 6, 1984)(Mem. Op. at 42–43); Restatement (Second) of Torts, § 766.

68. The Court specifically rejects Plaintiffs' contention that Lipson enjoyed a contractual right vis-a-vis his hospital privileges to participate in the anaesthesiology "on-call" schedule. While it is true that a hospital's by-laws can give rise to contractual rights and obligations in certain circumstances, *Dworkin*, 517 A.2d at 306 n. 5 (citations omitted), the Court can find no reference in the CCHS By-Laws to a "right" to participate in "on-call" coverage at the hospital. To the extent the right derives from a contract with ASPA, the law is clear that ASPA cannot tortiously interfere with a contract to which it is a party. *Wallace v. Wood*, Del. Ch., 752 A.2d 1175, 1182–83 (1999).

69. "[T]he principle distinction between [the two causes of action] being the availability to the defendant of a privilege to interfere within the limits of fair competition with prospective business opportunities." *First Nat'l Consumer Discount Co. v. Fuller*, Del.Supr., 419 A.2d 940, 942 (1980).

70. Lipson contends that ASPA conspired with CCHS to interfere with his prospective business relations with CRNAs and physicians and also to preclude ACCP from securing a contract with CCHS to provide anesthesia services at its hospital campuses. (D.I.1, ¶¶ 20(g), (j), (k)) These components of the intentional interference with prospective business relations claims will be treated by the Court as just that, components of a claim, as opposed to a separate cause of action for civil conspiracy. *See Ramunno v. Cawley*, Del. Supr., 705 A.2d 1029, 1039 (1998)("civil conspiracy is not an independent cause of action in Delaware, ... it must arise from some underlying wrong") (citation omitted).

Second, ASPA emphasizes again that Lipson voluntarily resigned from ASPA and, therefore, he should not be heard to complain that ASPA now is competing with him. Third, ASPA contends that Lipson cannot establish that ASPA has used "improper or unlawful" means to compete with Plaintiffs. (D.I. 24 at 3) Finally, ASPA alleges that its conduct amounted to nothing more than "fair competition" which, as a matter of law, is not actionable. (D.I. 24 at 3)

■ To sustain a claim for intentional interference with prospective contractual relations, a plaintiff must establish: "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with the opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of defendant's privilege to compete or protect his business interests in a fair and lawful manner...."[71] These elements direct the Court's analysis of the viability of Plaintiffs' claim here.

### a. The Existence of Prospective Business Relations

■ The prospective business relations which are subject to the protection of this cause of action are any which are of "potential ... pecuniary value to the plaintiff," including "the prospect of obtaining employees ... and any other relations leading to potentially profitable contracts."[72] But plaintiffs' mere "perception" of a prospective business relationship or contract will not "form the basis of a *bona fide* expectancy."[73]

■ Unfortunately, Plaintiffs have declined to direct the Court to any evidence of specific prospective business relations with which ASPA interfered within the voluminous record of interrogatories, supplemental interrogatories, documents, supplemental documents, affidavits and supplemental affidavits, supplied to the Court in connection with the motion *sub judice*. Nevertheless, the Court has culled through the record in search of evidence to support Plaintiffs' claim. The results of this search are reflected in the conclusions which follow.[74]

71. *DeBonaventura v. Nationwide Mut. Ins.*, 419 A.2d 942 (1980)(citing *Bowl-Mor, supra; Regal Home Distribs., Inc. v. Gordon*, Del.Super., 66 A.2d 754 (1949)).

72. Restatement (Second) of Torts, § 766B, comment c (1979).

73. *See Dionisi v. DeCampli*, Del. Ch., C.A. No. 9425, 1995 WL 398536, Steele, V.C. (June 28, 1995)(Mem. Op. at 24). *See also Bohatiuk v. Delaware Chiro. Services Network, L.L.C.*, Del.Super., C.A. No. 95C-10-277, Del Pesco, J. (Apr. 11, 1997)(Letter Op. at 6)(granting summary judgment when plaintiff failed to supply a factual basis to establish "a realistic expectancy" of a business relationship).

74. The specific prospective business relations identified by the Court here may not be exhaustive of the prospective business relations identified thus far in the discovery record. The narrative nature of the Plaintiffs' answers to interrogatories has made it extraordinarily difficult for the Court to distill this information from the record. Targeted contention interrogatories are favored by courts as a means to identify and narrow claims for trial. *See Carlton Investments v. TLC Beatrice Int'l. Holdings, Inc.*, Del. Ch., C.A. No. 13950, 1996 WL 132983, Allen, C. (March 15, 1996)(Mem.Op.at *11–12). To serve their intended purpose, however, the answers must be commensurately targeted. *Id.* No such responses have been provided by Lipson thus far. Accordingly, the Court, by separate Order, has directed Lipson to provide supplemental responses to contention interrogatories which enumerate in list form the specific prospective business relations with which ASPA allegedly interfered. If additional prospective opportunities are identified, ASPA may address them in a renewed motion for summary judgment at the conclusion of discovery if it deems such a motion to be appropriate.

With respect to Plaintiffs' allegation that ASPA interfered with their prospective business relations with surgeons and referral patients, ASPA contends that Plaintiffs have failed to identify with competent evidence any specific surgeon or patient whose request for Lipson's services was denied.[75] Moreover, ASPA argues that Plaintiffs have failed to identify a single specific instance where ASPA "manipulated" the operating room or call schedules to the detriment of Lipson or ACCP. Thus, according to ASPA, Plaintiffs, at best, have established with their general allegations nothing more than a "perception" of business relations with these constituencies.

ASPA's reading of the record is incorrect. For example, Plaintiffs have presented evidence that at least nine surgeons (who requested Lipson's services) were consistently prevented from scheduling Lipson as their anaesthesiologist. (D.I. 29, Ex. C at 21) Plaintiffs also have presented evidence suggesting that, after he severed his relationship with ASPA, Lipson was assigned disproportionately to Wilmington Hospital operating rooms, where the typical day brings less profitable assignments. (D.I. 29, Ex. C at 4) Viewing these facts most favorably to Plaintiffs, a rational trier of fact could determine that the prospective relations with these surgeons and patients could have yielded profitable contracts in the form of claims for reimbursement for services rendered with respect to these patients.[76]

As to the relations with potential CRNAs with whom ACCP sought to establish an employment relationship, Plaintiffs have identified several candidates for employment who allegedly were approached by ASPA with threats or misinformation about Lipson or the viability of his new medical practice. Accordingly, in so far as these CRNAs represented potential employees of ACCP, Plaintiffs have adequately identified prospective business relations with which ASPA allegedly has interfered.[77]

Plaintiffs also contend that a moratorium on the credentialing of new physicians and CRNAs imposed by CCHS interfered with their prospective employment relations with these unidentified putative candidates. Specifically, Lipson avers that during the moratorium, two doctors with whom he was negotiating (Drs. Blumberg and Lowson) summarily were denied requests to be credentialed. These potential employment relationships are sufficient to satisfy this element of the claim.[78]

Finally, Plaintiffs contend that ASPA interfered with their ability to secure an exclusive provider arrangement with CCHS. The undisputed record establishes that CCHS announced a request for proposal to provide exclusive anaesthesia services at all CCHS facilities. (D.I. 24, Ex. B at §§ 34–44) Certainly, to the extent this arrangement was available to Plaintiffs, it would qualify as "a potentially profitable contract" with CCHS and, as such, would be a valid "prospective business relation."[79]

**75.** The Court notes that business relations with prospective patients can form the basis of an intentional interference claim to the extent the physician plaintiff is able to identify specific patients and/or classes of patients. *See e.g. Olaf v. Christie Clinic Ass'n*, Ill.App., 200 Ill.App.3d 191, 146 Ill.Dec. 647, 558 N.E.2d 610, 614 (1990).

**76.** Restatement (Second) of Torts, § 766B, comment c (1979).

**77.** *Id.*

**78.** *Id.*

**79.** *Id.*

### b. The Interference with Prospective Relations

■ Having determined that Plaintiffs have identified several viable prospective business relations, the Court must now consider whether the factual record would allow a reasonable fact-finder to conclude that ASPA interfered with these prospective relations. In doing so, the Court must be mindful of the privilege enjoyed by competitors in the same market to compete aggressively for market share. " 'One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if (a) the relation concerns a matter involved in the competition between the actor and the competitor, and (b) the actor does not employ improper means, and (c) the actor does not intend thereby to create or continue an illegal restrain of competition, and (d) the actor's purpose is at least in part to advance his interest in his competition with the other.' " [80] Courts are obliged to consider these factors carefully because torts based on the notion of interference with existing or prospective business relations "may have the effect of chilling third parties from vigorously competing for business ..." [81] "Mindful of this risk, courts have tended to narrowly circumscribe the scope of this tort." [82]

In this case, ASPA contends that it is particularly entitled to avail itself of this privilege because Lipson voluntarily resigned from ASPA for the purpose of forming a competing medical practice. The Court already has determined that a factual dispute exists with respect to whether Lipson resigned or was constructively discharged from ASPA. Thus, the privilege to compete, on this record, is no more or less available to ASPA than it would be to any other competitor of Plaintiffs.

The elements of the tort of intentional interference and the elements of the privilege to compete ultimately lead the Court to the same inquiry: did the defendant *improperly* interfere with the plaintiffs' prospective business relations? In determining whether an interference with prospective business relations is improper, the Restatement (Second) of Torts identifies the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actors conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the societal interests in protecting the freedom of action of the other and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.' [83]

■ Plaintiffs bear the burden of proof with respect to all elements of the claim of intentional interference, including that the interference was improper. [84] Whether Plaintiffs have carried their burden to es-

80. *Regal Home Distributors,* 66 A.2d at 754 (citing Restatement of Torts, § 768). *See also Shearin v. E.F. Hutton Group, Inc.,* Del. Ch., 652 A.2d 578 (1994).

81. *Shearin,* 652 A.2d at 589.

82. *Id.* (citation omitted).

83. *Elder v. El Di, Inc.,* Del.Super., C.A. No. 96C–09–007, Graves, J. (April 24, 1997)(Mem. Op. at 26)(quoting Restatement (Second) of Torts, § 767). *See also Regal Home,* 66 A.2d at 754.

84. *See Local Union 42 v. Absolute Environ. Services,* D. Del., 814 F.Supp. 392, 401 n. 10 (1993).

tablish improper interference is typically a question of fact for the jury.[85]

Turning to Plaintiffs' specific allegations of interference, it appears to the Court that some of the claims are sufficiently grounded in facts to proceed to the next step of the prescribed analysis; some are not.

 Plaintiffs' allegation that ASPA interfered with Lipson's and ACCP's prospective relations with physicians and referral patients finds support in Plaintiffs' answers to interrogatories. There, Plaintiffs explain that ASPA exercised at least *de facto* control over the operating room schedule and that after Lipson departed from ASPA he was assigned less lucrative cases for no apparent reason. Lipson also has supported with specific examples his contention that ASPA's control over the assignment of cases allowed it to decline requests from surgeons and patients for Lipson's services. If proven, this sort of control over the applicable market, exercised arbitrarily by one empowered to do so by means other than competitive merit (e.g. hospital authority), is more inconsistent than consistent with notions of free competition. Based on the foregoing, the Court cannot conclude that the privilege to compete bars this claim, nor can it conclude that there are no material issues of fact to present to a jury with respect to this claim.

For its part, ASPA has identified several instances in which it honored special requests for Lipson's services. This sounds like a good factual controversy for the jury to resolve. Accordingly, the motion for summary judgment is **DENIED** as it relates to the allegations in Count I which

address interference with prospective relations with surgeons and referral patients.

 Plaintiffs also contend that ASPA improperly interfered with their prospective relations with CRNAs who were candidates to join ACCP. Specifically, Plaintiffs contend that ASPA's CRNAs were threatened with retribution within the Department of Anaesthesiology if they went to work for Lipson. (D.I.29, Ex. C, Attach.22) In addition, Lipson has averred that CRNA Paul Olivere actually tendered his resignation to ASPA so that he could work for Lipson, but after a stern talk with physicians from ASPA's Executive Committee, he withdrew his resignation. (D.I. 25, Interrog. Answer 25) Lipson also contends that Dr. Golden raised unfounded questions with CRNAs regarding Lipson's ability to pay them. Viewing the facts most favorably to Plaintiffs, these actions would be consistent with a plan by ASPA to prevent Lipson and/or ACCP from establishing employment relationships with CRNAs; relationships which were, of course, essential to the success of Lipson's new practice. Moreover, these facts, if proven, could establish that ASPA's actions were wrongful and motivated by malice. The motion for summary judgment is **DENIED** as it relates to the allegations in Count I which address interference with prospective employment relationships with CRNAs.

 Plaintiffs contend that ASPA conspired with CCHS to impose a moratorium on staff privileges within the Department of Anaesthesiology just as ACCP was trying to develop its practice. The elements of a civil conspiracy claim are: 1) a confederation or combination of two or more persons; 2) an unlawful act in furtherance of the conspiracy; and 3) actual

---

85. *See Grand Ventures, Inc. v. Paoli's Restaurant, Inc.*, Del.Super., C.A. No. 95C–03–013, 1996 WL 30022, 1996 Del.Super. LEXIS 3, Graves, J. (Jan. 4, 1996)(Mem.Op.at *9).

damages.[86] "[C]ivil conspiracy is not an independent cause of action in Delaware, ... it must arise from some underlying wrong."[87] Here, Plaintiffs have alleged a conspiracy in the context of their claim that ASPA interfered with their prospective relationship with physicians and CRNAs who were poised to join the practice.

■ A claim of conspiracy may be proven with circumstantial evidence.[88] It may not, however, be sustained on bare allegations supported by no more than speculation and innuendo.[89] But speculation is all that supports Plaintiffs' "conspiracy theory" with respect to the moratorium. Plaintiffs have presented absolutely no evidence—circumstantial or otherwise—that ASPA and CCHS reached a meeting of the minds to impose a moratorium on credentialing within the Department of Anaesthesiology for the purpose of harming Lipson or his medical practice. The moratorium appears to have been a matter of internal hospital administration which, as best as the Court can tell from the record, had little if anything to do with Lipson. And, moreover, in the context of an intentional interference claim against *ASPA,* one cannot lose sight of the fact that the moratorium was imposed by

CCHS, not ASPA. (D.I 24, Ex. B, § 50 & Attach. 24) The facts of record simply do not support Plaintiffs' contention that, by virtue of the moratorium, ASPA interfered with their prospective relations with physicians or CRNAs, either individually or in conspiracy with CCHS.[90] Consequently, the motion for summary judgment is **GRANTED** as it relates to the allegations in Count I which address the alleged civil conspiracy to effect a moratorium on staff privileges within CCHS' Department of Anaesthesiology.

■ Likewise, the record provides no support for Plaintiffs' contention that ASPA interfered with Plaintiffs' prospective business relation with CCHS by somehow improperly influencing CCHS' decision to embark on an exclusive provider relationship with ASPA. The Court begins its analysis with the undisputed proposition that a hospital is free to enter into exclusive provider contracts.[91] ASPA was free to bid for this opportunity. To overcome ASPA's privilege to compete, Plaintiffs must, *inter alia,* present some evidence to suggest that ASPA competed by improper means. But instead, Plaintiffs simply allege that ASPA "conspired with senior administrative officers of CCHS and their counselors to create the [exclusive

**86.** *S & R Assocs. v. Shell Oil Co.,* Del.Super., 725 A.2d 431, 440 (1998)(citing *Nicolet Inc. v. Nutt,* Del.Supr., 525 A.2d 146, 149–50 (1987)).

**87.** *Ramunno v. Cawley,* Del.Supr., 705 A.2d 1029, 1039 (1998) (citation omitted).

**88.** It is clear that "a conspiracy may be proved by circumstantial evidence as well as by direct evidence...." *Connolly v. Labowitz,* Del.Super., 519 A.2d 138, 144 (1986).

**89.** *See Tuckman v. Aerosonic Corp.,* Del. Ch., C.A. No. 4094, 1982 WL 17810, Hartnett, V.C. (May 20, 1982)(Mem. Op. at 34)(declining to find civil conspiracy based on "speculation and circumstantial evidence").

**90.** *Bickling,* 872 F.Supp. at 1304 (party with burden of proof must present evidence in support of claim to survive summary judgment).

**91.** *See, e.g., Belmar v. Cipolla,* N.J.Supr., 96 N.J. 199, 475 A.2d 533, 539–40 (1984)(approving of exclusive contracts where hospital motivated by desire to provide high quality medical services); *Tenet Health, Ltd. v. Zamora,* Tex.App., 13 S.W.3d 464, 470 (2000)(holding that a hospital entering into an exclusive services contract did not alter the privileges of a physician credentialed but not associated with the recipient of the contract).

contracting] process so as to 'legitimize' the institutionalization [sic] of [ASPA's] monopoly." (D.I. 21, Interrog. Answer 57) Plaintiffs have not supplied the Court with legal or factual authority to counter ASPA's right to negotiate to become CCHS's exclusive provider of anaesthesia services, or even to suggest that ASPA's motives were anything other than legitimate competition.[92] Plaintiffs' "belief" or bare allegation that a conspiracy was in the works is not sufficient to survive a motion for summary judgment. Consequently, the motion for summary judgment is **GRANTED** as it relates to the alleged civil conspiracy to interfere with Plaintiffs' ability to secure an exclusive provider agreement with CCHS.

### c. Proximate Causation and Damages

 The final elements of Plaintiffs' *prima facie* case for intentional interference with prospective business relations are proximate causation and damages. Generally, the issues of causation and damages are left for the jury.[93] The Court is content that Plaintiffs should be permitted an opportunity to develop their causation and damages case in discovery with respect to the interference with prospective business relations claims which have survived this motion for summary judgment.

### I. Unfair Trade Practices

 In Count IV of their complaint, Plaintiffs have repackaged most of their defamation and intentional interference claims and have placed the title of "Unfair

Trade Practices" on the label, presumably in an effort to avail themselves of the favorable damages associated with such claims.[94] In *Dionisi,* supra, then Vice Chancellor Steele explained the narrow scope of the Unfair Trade Practices cause of action:

> A party seeking to recover [for Unfair Trade Practices] must have a basis for injunctive relief. The Act is designed to encourage immediate or at least timely enforcement of its provisions to halt unfair or deceptive trade practices between businesses with "horizontal relationships." ... Injunctive relief coupled with the possibility of treble damages and counsel fees looms as a powerful deterrent against wrongdoers and an incentive to litigate for the wronged. *It is not a vehicle for damages long after the immediacy of the grievance dissipates.* When the press for instant action eases, so does the basis for possible concomitant damages. The [Unfair Trade Practices Act] is not a platform for an independent common law damage suit.[95]

Plaintiffs have declined to seek injunctive relief, and wisely so. The incidents of which they complain occurred more than one year before the complaint was filed and more than two years from the time of this writing. Lipson has moved on to new challenges as a professor and attending physician at the University of Pennsylvania Hospital. The "press for instant action" eased long ago. Accordingly, the claim for Unfair Trade Practices is misplaced and the motion for summary judgment as to Count IV of the complaint is **GRANTED.**

---

92. *See* Restatement (Second) of Torts, § 767.

93. *See Naidu v. Laird,* Del.Supr., 539 A.2d 1064, 1075 (1988); *Faircloth v. Rash,* Del. Supr., 317 A.2d 871 (1974); *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 469 (1962).

94. *6 Del. C.* § 2531 *et seq.* is Delaware's Deceptive Trade Practices Act.

95. *Dionisi, supra,* Mem. Op. at 25–26 (emphasis supplied).

## IV. CONCLUSION

For the reasons set forth above, ASPA's motion for summary judgment: is **DENIED** to the extent it relies upon peer review immunity; is **GRANTED** in part and **DENIED** in part as to Count I of the complaint; is **GRANTED** as to Count II; is **DENIED** as to Count III; is **GRANT-** ED as to Count IV; and is **DENIED** as to Count V.

**IT IS SO ORDERED.**