GATEWAY CARDIOLOGY, P.C.,
Nizar Assi, and Bassam Al–
Joundi, Appellants,

v.

William WRIGHT, M.D., Respondent.

No. ED 87226.

Missouri Court of Appeals,
Eastern District,
Division One.

Oct. 31, 2006.

Thomas E. Wack, St. Louis, MO, for appellants.

Victor S. Williams, St. Charles, MO, for respondent.

PATRICIA L. COHEN, Judge.

Gateway Cardiology, P.C., Nizar Assi, M.D. and Bassam Al–Joundi, M.D. (Plaintiffs) appeal from the trial court's grant of summary judgment in favor of William Wright, M.D. on Count III of Plaintiffs' third amended petition.[1] In Count III, Plaintiffs alleged that Dr. Wright's claim that Dr. Assi conducted medically unnecessary procedures constituted an accusation of billing fraud resulting in the impairment of Plaintiffs' business relationships and consequent loss of business and business

---

1. Plaintiffs voluntarily dismissed Counts I and II.

expectancies. As grounds for summary judgment, the trial court concluded that the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. Section 11101, *et seq.* provided Dr. Wright with immunity.[2] On appeal, Plaintiffs challenge the trial court's grant of immunity. We affirm.

### Factual Background

Drs. Assi and Al–Joundi are interventional cardiologists who, with another cardiologist, formed Gateway Cardiology, P.C. in 1994. Dr. Wright is also an interventional cardiologist and practices with the Cardiology Consultants of St. Louis, P.C. Drs. Assi and Al–Joundi, as well as Dr. Wright, focus their practices in south St. Louis County and, more specifically, at St. Anthony's Medical Center, where both physician groups maintain offices.

In 1998, Dr. Wright assumed the position of director of St. Anthony's Cardiac Catheterization Laboratory (Cath Lab). Dr. Wright's duties included overseeing the professional competence of physicians providing care in the Cath Lab. In October 2003, St. Anthony's approached Dr. Al–Joundi about replacing Dr. Wright as Director of the Cath Lab at the end of Dr. Wright's term. Subsequent to this discussion, St. Anthony's sent Dr. Al–Joundi, as well as Dr. Wright, a proposal identifying Dr. Al–Joundi as Dr. Wright's successor. Shortly thereafter, St. Anthony's forwarded an agreement to Drs. Al–Joundi and Wright in which Dr. Al–Joundi was identified as Dr. Wright's successor.

In January 2004, Dr. Wright sent correspondence to Thomas Rockers, St. Anthony's President and CEO, advising Mr. Rockers that Dr. Wright could not "in good conscience" agree to Dr. Al–Joundi's appointment as Director of the Cath Lab. In support of his opposition, Dr. Wright detailed several matters including: (1) St. Anthony's 1999 denial of active staff status to Drs. Al–Joundi and Assi (2) St. Anthony's receipt of a "threatening letter" from Drs. Al–Joundi and Assi's attorney after St. Anthony's denied them active staff status and (3) Dr. Wright's concern about numerous cases in which procedures were performed without the proper hospital privileges or patient consents. Dr. Wright concluded his letter with the statement that he had brought his concern about these cases to the attention of Dr. Gibson, chair of the Cardiovascular Care Review Committee (CCRC) and Dr. Sewall, chief of the cardiology section, and that they, along with Dr. Curtin, director of the Department of Medicine and Mr. Cardenas, St. Anthony's compliance officer and legal counsel, planned to meet on January 14, 2004 to review Dr. Wright's concerns.[3]

Following the January 14 meeting, Dr. Curtin informed Dr. Assi by telephone and confirmatory letter that Drs. Sewall, Wright and Gibson had arranged a meeting to which Dr. Assi, and any cardiologist he wished to accompany him, were invited to discuss procedures performed on five of Dr. Assi's patients. In two separate follow-up letters, Dr. Curtin: (1) advised Dr. Assi that "the only issue to be discussed was 'medical necessity' for performing the procedures in question," and (2) identified the specific patients and the medical procedures the doctors intended to review.

Around the same time as Dr. Curtin's letter to Dr. Assi, Dr. Wright forwarded an extensive memorandum to Mr. Cardenas and Dr. Curtin in which he outlined, in

---

**2.** We note that HCQIA confers immunity from liability for damages, rather than from suit. *See* 42 U.S.C. Section 11111(a).

**3.** The trial court referred to this committee as the Ad Hoc Committee and although Dr. Wright refers to this committee as the Special Review Committee we use the trial court's designation here.

detail, his concerns about specific procedures performed primarily by Dr. Assi. The bulk of the information was intended to support Dr. Wright's conclusion that Dr. Assi performed procedures that were medically unnecessary. Dr. Wright referred to fraud twice in the memorandum. At one point, Dr. Wright noted that "Mr. Cardenas was to inform [Dr. Assi] that St. Anthony's would be refunding the receipts on these fraudulent cases and notifying the payers." At another point, Dr. Wright identified a particular patient who had two procedures on consecutive days and stated "it is fraudulent to subject the patient to two separate procedures, which you can bill for separately, as to performing them on the same day."

The Ad Hoc Committee, absent Dr. Wright, met with Dr. Assi on February 2, 2004. Dr. Wright did not attend the meeting at Dr. Assi's request. Following the meeting, Dr. Curtin related his, Dr. Sewall, and Dr. Gibson's conclusions to Dr. Assi in a February 6 letter, stating:

> Dear Dr. Assi,
>
> Thank you for meeting with Dr[.] Sewall, Dr[.] Gibson and me on February 2 to discuss the cases we were concerned about. Following that meeting, I have met and had further discussion with Drs[.] Sewall and Gibson, and Drs[.] Sewall, Gibson and I have discussed our findings with Dr[.] Wright and John McGuire, CFO at St. Anthony's. We have concluded that none of the procedures performed were medically unnecessary. Some of them, however, fall outside the typical practice pattern for IVRT. We would therefore request that you amend the reports on [Patients A, B, and C] to include the justifications for the procedures that you discussed with us on February 2. We would also ask that in the future you fully document the

indications for IVRT. These cases will be referred to the Cardiology Care Review Committee as well. Thank you for your cooperation.

In response, Dr. Assi sent a detailed letter explaining his approach to each patient's treatment. He also communicated general information relating to the procedures at issue, including guidelines from the American College of Cardiology. In addition, Dr. Assi provided an opinion from a recognized expert in interventional cardiology opining that the treatment provided the patients was not unnecessary.

Following the Ad Hoc Committee's determination that "none of the procedures performed were medically unnecessary," Dr. Wright forwarded a letter to Mr. Cardenas stating that "it was decided there was not a consensus that [Drs. Assi and Al–Joundi's] cases did not meet medical necessity...." Dr. Wright also informed Mr. Cardenas that the cases under discussion were to be forwarded to St. Anthony's CCRC. In a subsequent memorandum to the CCRC, Dr. Wright referred for review fifteen cases in which procedures had been performed by either Drs. Assi or Al–Joundi.

On April 7, the CCRC, which consisted of sixteen members, including Drs. Wright and Al–Joundi, met and reviewed one of Dr. Assi's cases.[4] Following the meeting, Dr. Gibson sent a memorandum to Dr. Assi noting that the review was for "treatment concerns." After disclosing to Dr. Assi the substance of the records the CCRC reviewed as well as the CCRC's conclusions, Dr. Gibson requested "data to support why this candidate was an appropriate candidate for [the procedure in question]."

---

4. Dr. Wright presented the case review and Dr. Al–Joundi, after objecting to Dr. Wright's involvement, was asked to recuse himself and did so.

On July 14, the CCRC again met and discussed the case previously considered at the April 7 meeting. The minutes from the meeting reflected that the CCRC discussed at length a letter from Dr. Assi. The CCRC minutes further noted that the attending members acknowledged "profound differences" among practitioners regarding the medical procedure at issue and its timing. In any event, by a vote of nine to four, the CCRC agreed to close the case under review. Likewise, the committee voted to "drop further review of similar cases of concern that were still pending before this committee."

### Procedural Background

Plaintiffs filed suit against Dr. Wright and his physician group, Cardiology Consultants of St. Louis, P.C. in March 2004. Plaintiffs alleged in a one-count petition that Dr. Wright and Cardiology Consultants intentionally interfered with the relationships that Plaintiffs had with St. Anthony's.

In response to the petition, Dr. Wright and Cardiology Consultants filed a motion to dismiss asserting, among other things, that the defendants' actions were privileged under HCQIA. Thereafter, Plaintiffs filed a first amended petition enlarging the allegations in the petition and, *inter alia*, asserting an absence of justification. Subsequently, Dr. Wright filed an answer to the first amended petition in which he asserted, as an affirmative defense, that his actions were privileged under HCQIA. Plaintiffs filed a second amended petition naming only Dr. Wright as a defendant.

In response to the second amended petition, Dr. Wright filed a motion for summary judgment contending, in essence, that even if Dr. Wright: (1) interfered with Plaintiffs' appointment to the active staff by raising quality of care issues, (2) interfered with Dr. Al–Joundi's appoint-ment as Cath Lab director by accusing Drs. Assi and Al–Joundi of improper practices and (3) interfered with Plaintiffs' "general business expectancies" through "abuse of the peer review process," he was immune from suit under HCQIA. The trial court granted the motion for summary judgment, in part, concluding that "Defendant's accusations that were reviewed by the Ad Hoc Committee and the CCRC are immune pursuant to the Health Care Quality Improvement Act." In particular, the trial court determined that "[t]o the extent that Defendants' (sic) accusations to committees, which were investigated by committees, caused Dr. Al–Joundi to not be appointed as director of the cardiac Cath Lab and caused the loss of other privileges to Plaintiffs, the Court . . . finds the Defendant is immune for such accusations to the Committees."

Following the trial court's grant of partial summary judgment, Plaintiffs filed a third amended petition which, for the first time, separated the factual allegations into three individual counts of interference with business relationships, as follows: (1) Count I alleged interference with appointment to the active staff (2) Count II alleged interference with appointment to the Director of the Cath Lab and (3) Count III alleged damaging accusations that Dr. Assi conducted medically unnecessary procedures constituting "billing fraud against medical and private insurance carriers." Defendant renewed his Motion for Summary Judgment and the trial court granted summary judgment as to Count III on the grounds set forth in the trial court's previous order of partial summary judgment, namely HCQIA immunity.

### Standard of Review

Our review of summary judgment is *de novo*. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854

S.W.2d 371, 376 (Mo. banc 1993). In addition we review the record on summary judgment in the light most favorable to the party against whom judgment was entered. *Id.* If the movant is entitled to judgment as a matter of law and no genuine material issues of fact exist, we will uphold the judgment. *Id.* at 377.

■ When considering the grant of summary judgment on the grounds of HCQIA immunity, we keep in mind that HCQIA establishes a rebuttable presumption that immunity attaches where a "professional review action ... of a professional review body meets all the standards specified in Section 11112(a)...." 42 U.S.C. 11111(a); *see also Singh v. Blue Cross/Blue Shield of Massachusetts,* 308 F.3d 25, 31 (1st Cir.2002). We have also recognized that HCQIA establishes a presumption that "a professional review action meets the standards in [HCQIA] unless the presumption is rebutted by a preponderance of the evidence." *Joshi v. St. Luke's Episcopal–Presbyterian Hospital,* 142 S.W.3d 862, 866 (Mo.App. E.D.2004) (internal citation omitted). Finally, we have described our summary judgment standard of review in HCQIA cases as embodying the following question: "Might a reasonable jury, viewing the facts in the best light for the [plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of Section 11112(a)?" *Misischia v. St. John's Mercy Medical Center,* 30 S.W.3d 848, 858 (Mo.App. E.D. 2000) (internal citation omitted). In short, the plaintiff bears the burden of proving the peer review process was not reasonable. *Id.*

### Discussion

Plaintiffs raise four points on appeal. Each point is designed to establish that the trial court erred in granting immunity under Section 11111(a) of HCQIA.[5] In point one, Plaintiffs contend that Dr. Wright's accusations of "billing fraud" fell within the meaning of Section 11151(9)— the "physician's fees" exception—and therefore did not constitute a protected "professional review action" based on the competence or professional conduct of a

---

**5.** Section 11111(a) provides in pertinent part:

(1) Limitation on damages for professional review actions

If a professional review action ... of a professional review body meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b) of this section—
(A) the professional review body,
(B) any person acting as a member or staff to the body,
(C) any person under a contract or other formal agreement with the body, and
(D) any person who participates with or assists the body with respect to the action,
shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action. The preceding sentence shall not apply to damages under any law of the United States or any State relating to the civil rights of any person or persons, including the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq. and the Civil Rights Acts, 42 U.S.C. 1981, et seq. Nothing in this paragraph shall prevent the United States or any Attorney General of a State from bringing an action, including an action under section 15c of Title 15, where such an action is otherwise authorized.

(2) Protection for those providing information to professional review bodies

Notwithstanding any other provision of law, no person (whether as a witness or otherwise) providing information to a professional review body regarding the competence or professional conduct of a physician shall be held, by reason of having provided such information, to be liable in damages under any law of the United States or of any State (or political subdivision thereof) unless such information is false and the person providing it knew that such information was false.

physician as provided by HCQIA. In point two, Plaintiffs argue that the Ad Hoc Committee was not a "professional review body" because it did not follow a "formal peer review process" and did not assist the CCRC in a "professional review activity." In point three, Plaintiffs assert, in essence, that an adverse "professional review action" is a predicate for the grant of immunity and here no adverse professional review action occurred. Finally, in point four, Plaintiffs claim that disputed issues of material fact exist regarding: (1) whether Dr. Wright had a "reasonable belief" that his conduct was "in furtherance of quality health care" and (2) whether Dr. Wright engaged in a "reasonable effort to obtain the facts of the matter."

## A. Is the physician's fees exception of HCQIA applicable?

 Plaintiffs contend that Dr. Wright's conduct does not constitute a "professional review action" within the meaning of HCQIA because Dr. Wright's allegations of fraud trigger the "physician's fees" exception set forth in 42 U.S.C. Section 11151(9) of HCQIA, which defines "professional review action" as follows:

(a) The term "professional review action" means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients) ... such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action. In this chapter an action is not to be considered to be based on the competence or professional

conduct of a physician if the action is primarily based on—

. . .

(B) the physician's fees or the physician's advertising or engaging in other competitive acts intended to solicit or retain business ...

(E) any other matter that does not related to the competence or professional conduct of a physician.

In arguing for application of the "physician fees" exception, Plaintiffs assert that "the *ad hoc* committee investigation was completely, not just 'primarily' about physician's fees." To support their contention, Plaintiffs identify two accusations made by Dr. Wright: (1) "performing a balloon angioplasty without a 70% stenosis was Medicare fraud" and (2) "performing delayed IVRT was another form of billing fraud." Both of these concerns appear in lengthy memoranda, authored by Dr. Wright, discussing the care of specific patients.

As an initial matter, Plaintiffs acknowledge that there are no decisions interpreting the "physician's fees" exception. However, while suggesting that this Court "need not determine its precise contours," Plaintiffs nevertheless advocate for a very broad interpretation of the "physician's fees" exception. Indeed, in a convoluted leap, Plaintiffs contend that a review of medical necessity is synonymous with an investigation of billing fraud which is equivalent to a "professional review action" primarily based on "physician's fees."

Even if we were to conclude that the "physician's fees" exception encompassed allegations of billing fraud under the circumstances here, a notion which finds virtually no support in the statute, we reject Plaintiffs' argument that the Ad Hoc Committee's actions were "*primarily* based on the physician's fees." 42 U.S.C. Section

11151(9)(B). (emphasis added). Rather, the record very clearly convinces us that the activities in question were concerned primarily with the "competence or professional conduct of a physician." *Id.*

The record establishes that Dr. Wright's written materials, including the allegations set out in the January 12, 2004 letter to Mr. Rockers, St. Anthony's President, as well as later memoranda addressed to Dr. Curtin, St. Anthony's director of the Department of Medicine and Renee Haven (of the CCRC), were replete with detailed concerns regarding care and treatment of specific patients. Likewise, Dr. Curtin's summary of the Ad Hoc Committee's medical necessity concerns reveals a focus on the advisability of medical procedures performed on specific patients. Moreover, in Dr. Assi's lengthy response to Dr. Curtin's notice of concerns, he discussed in great detail patient care and treatment. Nothing in Dr. Assi's letter suggests he was addressing concerns regarding the propriety of fees. Finally, the conclusion of the Ad Hoc Committee did not refer to either fees or fraud but, rather stated as follows:

> We have concluded that none of the procedures performed were medically unnecessary. Some of them, however, fall outside the typical practice pattern for IVRT. We would therefore request that you amend the reports on [Patients A, B, C] to include the justifications for the procedures that you discussed with us on February 2.

Point one is denied.

**B. Was the Ad Hoc Committee a "professional review body" assisting in a "professional review activity"?**

**1. Professional review body**

■ Plaintiffs argue in point two that the Ad Hoc Committee was not a "professional review body" within the meaning of HCQIA because: (1) the Ad Hoc Committee did not follow a "formal peer review process" and (2) the Ad Hoc Committee

did not assist the CCRC in a "professional review activity." More specifically, Plaintiffs contend that Dr. Wright, rather than St. Anthony's, formed the Ad Hoc Committee. In addition, Plaintiffs claim that because the Ad Hoc Committee considered "medical necessity" and the CCRC investigated "quality of care," the Ad Hoc Committee's activities did not assist the CCRC.

HCQIA confers protection from liability for damages if a "professional review action ... of a professional review body" meets all the standards specified in Section 11112(a). HCQIA defines "professional review body" as follows:

> ... a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity.

42 U.S.C. Section 11151(11). HCQIA defines "health care entity" in pertinent part as:

> (4)(A) The term health care entity means-
>
> (i) a hospital that is licensed to provide health care services by the State in which it is located,
>
> (ii) an entity (including a health maintenance organization or group medical practice) that provides health care services and that follows a formal peer review process for the purpose of furthering quality health care (as determined under regulations of the Secretary), and
>
> (iii) subject to subparagraph (B), a professional society (or committee thereof) of physicians or other licensed health care practitioners that follows a formal peer review process for the purpose of furthering quality health care (as deter-

mined under regulations of the Secretary).

Section 11151(4)(A).

We conclude that the record supports a finding that the Ad Hoc Committee was a committee of St. Anthony's and thus governed by Section 11151(4)(A)(i) rather than, as Plaintiffs argue, Section 11151(4)(A)(ii). First, the record establishes that St. Anthony's legal counsel and compliance officer, Mr. Cardenas, directed Dr. Wright to conduct an investigation. Second, the members of the Ad Hoc Committee all held significant positions of St. Anthony's, including the chief of the department of internal medicine, chairman of the CCRC, chief of the cardiology section, Director of the Cath Lab, chief financial officer, compliance officer and legal counsel. Third, the chair of the Ad Hoc Committee was not Dr. Wright, but Dr. Curtin. Finally, the uncontradicted affidavit of St. Anthony's chief financial officer, John McGuire, reveals that the Ad Hoc Committee was formed on the recommendation of Mr. Cardenas and under the authority of St. Anthony's CEO, Mr. Rockers.

Plaintiffs' heavy reliance on *Lipson v. Anesthesia Services, P.A.*, 790 A.2d 1261 (Del.Super.2001) does not persuade us otherwise. In *Lipson*, the plaintiff brought suit against his former medical practice group. *Id.* at 1265. Rejecting the medical practice group's invocation of HCQIA immunity, the Delaware Supreme Court found that the practice group was not acting as a professional review body and was not engaged in protected professional review action. However, importantly, the court noted that if the record had supported the medical practice group's contention that it had conducted the investigation of the plaintiff at the request of the hospital's department head and on behalf of the hospital the court "easily would conclude that [the medical practice group] was a 'professional review body' which if engaged in 'professional review action' would enjoy HCQIA immunity." Here, in contrast to the *Lipson* court, we find that the record supports a determination that the investigation of Plaintiffs was undertaken at the request of not only a St. Anthony's department head but also St. Anthony's administrators and was on behalf of St. Anthony's.[6] Accordingly, we find that the Ad Hoc Committee was a "professional review body" within the meaning of HCQIA.

### 2. Professional review activity

HCQIA defines the term "professional review activity" as:

[A]n activity of a health care entity with respect to an individual physician to determine (A) whether the physician may

---

**6.** St. Anthony's by-laws provided that department heads, such as Dr. Wright, were "responsible for the quality of service in that department and for proper management of that department. This will include on-going evaluation of the professional competence of each practitioner in his department." In the context of HCQIA, we have held that where a physician acts in his capacity as a department head and works with others in reviewing cases, the physician has not acted unilaterally. *Joshi v. St. Luke's Episcopal–Presbyterian Hospital*, 142 S.W.3d 862, 868 (Mo.App.E.D. 2004). We also disagree with Plaintiffs' statement that simply because *Cowan v. Gibson*, 392 S.W.2d 307 (Mo.1965), a pre-HCQIA case, has been cited post-HCQIA, Missouri courts "allow tort claims made against an individual physician who individually seeks to interfere with plaintiffs' staff privileges." Although we do not foreclose tort claims between physicians under appropriate circumstances, we note that in our most recent post-HCQIA case, *Joshi*, two of the three defendants were individual physicians and plaintiff alleged that at least one of the individual physicians, Dr. Bashiti, acted unilaterally rather than on behalf of a hospital and had anti-competitive motives. Nevertheless, we affirmed summary judgment on the basis of HCQIA immunity.

have clinical privileges with respect to, or membership in, the entity, (B) the scope or conditions of such privileges or membership, or (C) to change or modify such privileges or membership.

42 U.S.C. Section 11151(10). Professional review activities are generally precursors to professional review actions. *Singh,* 308 F.3d at 36. "Professional review activity means the investigative process during and/or upon which a professional review action, i.e., a decision is made." *Mathews v. Lancaster,* 87 F.3d 624, 634 (3rd Cir. 1996). Here, the Ad Hoc Committee reviewed between eight to fifteen cases handled by either Dr. Assi or Dr. Al–Joundi. The Ad Hoc Committee held multiple meetings and generated considerable correspondence discussing these cases. Dr. Wright also contacted a respected cardiologist, Dr. LaSala, to review the cases. Furthermore, the Ad Hoc Committee met with Dr. Assi to discuss the cases and sent a letter to Dr. Assi explaining its conclusions. Although the Ad Hoc Committee determined that none of the procedures the committee investigated were medically unnecessary, "some of them, however, fall outside the typical practice pattern for IVRT." Consequently, the Ad Hoc Committee requested Dr. Assi to amend his reports and "fully document the indications for IVRT." The Ad Hoc Committee also referred cases to the CCRC for further review. These activities clearly fall within HCQIA's definition of "professional review activity" and support a conclusion that the activities of the Ad Hoc Committee assisted the CCRC.

### C. Is HCQIA immunity available in the absence of adverse action?

■ In point three, Plaintiffs argue that the "whole predicate of Section 11111(2)(a) immunity is an adverse 'professional review action.'" Thus, Plaintiffs contend, that where, as here, no adverse action was taken against a physician, HCQIA immunity is not available. More specifically, Plaintiffs assert that if HCQIA immunity attaches even where a physician is exonerated "the defendant can do whatever he wants—with full knowledge that there will be no consequences to him."

Plaintiffs' position is inconsistent with express language contained in HCQIA. Section 11151(9) provides that "a professional review action ... includes a formal decision of a professional review body not to take an action or make a recommendation ... and also includes professional review activities relating to a professional review action." Section 11111(a)(1), the statutory section governing HCQIA immunity, specifically incorporates the definition of "professional review action" contained in Section 11151(9). Contrary to Plaintiffs' contention, the term "adverse" does not modify the term "professional review action" either in Section 11111(a)(1) or Section 11151(9). Rather, reading the two sections together, it is quite obvious that not only does the statute contemplate immunity where no adverse action is taken but also extends immunity to the underlying activities culminating in a decision not to take adverse action against the physician. Point denied.

### D. Does HCQIA immunity require a finding that Dr. Wright personally (1) had a "reasonable belief" that his conduct was in "furtherance of quality health care" and (2) made a "reasonable effort to obtain the facts of the matter"?

■ In point four, Plaintiffs contend, in essence, that the trial court erred because it failed to analyze whether Dr. Wright personally held a reasonable belief that his conduct was in "furtherance of quality health care." As the Plaintiffs stated in their brief, "the trial court considered only what the committee did and ignored everything that [Dr. Wright] did." Plaintiffs also argue that Dr. Wright failed to make

a "reasonable effort to obtain the facts of the matter," and therefore failed to satisfy Section 11112(a)(2).

Plaintiffs' position is not consistent with Sections 11111(a), as set forth herein at footnote 5, or 11112(a) of HCQIA. Section 11111(a) limits damages for professional review actions if a "professional review action (as defined in Section 11151(9) of this title) of a professional review body meets all the standards specified in Section 11112(a) of this title...." Section 11112(a) requires that:

A professional review action must be taken—(1) in the reasonable belief that the action was in furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3).

Both sections focus exclusively on the nature of the "professional review action." That is, if the "professional review action" meets the standards in Section 11112(a), then immunity is properly conferred upon the persons or entities identified in Section 11111(a)(1)(A)-(D). In contravention of HCQIA, Plaintiffs seek to ignore this statutory equation, urging us to focus on the motives of the person or entities identified in Section 11111(a)(1)(A)-(D) rather than the objective reasonableness of the professional review action. Adoption of Plaintiffs' position requires us to disregard

HCQIA's relevant statutory language and we decline to do so.[7]

Plaintiffs rely on two cases in support of their theory that Dr. Wright's motives, rather than the professional review action is the proper focus of a HCQIA immunity analysis: *Misischia v. St. John's Medical Center*, 30 S.W.3d at 857 and *Poliner v. Texas Health Systems*, 2003 WL 22255677 (N.D.Tex.2003). We do not find that either of these cases support Plaintiffs' position. As an initial matter, *Misischia* did not address the denial of HCQIA immunity with regard to the defendant physician, presumably because the issue was not raised on appeal. However, this Court did conclude that "[u]nder Section 11111, a professional review board and its members are deemed to be immune from liability under state law for damages stemming from the actions taken by that body if *it* has complied with the standards set forth in Section 11112(a)." *Id.* at 858 (emphasis added). Moreover, our Court rejected the proposition that HCQIA immunity was not appropriate where the thrust of the plaintiff's argument was that the defendant physician's "subjective motivation was to get rid of plaintiff...." *Id.*

Plaintiffs' reliance on *Poliner* is equally unavailing. Plaintiffs argue that *Poliner* supports the denial of immunity in this case because several of the defendant doctors who did not receive immunity in *Poliner* did "things" similar to Dr. Wright. A review of *Poliner* reveals, however, that the court properly focused on whether the action in question—a summary suspension of privileges—"was taken in accordance with HCQIA." 2003 WL 22255677 at *10. In reaching the conclusion that immunity

---

7. It should be noted that Plaintiffs do not claim that the trial court erred in failing to find that the *professional review action* (or as is relevant in this case, the decision not to take adverse action) was taken in accordance with Section 11112(a). Rather, the point on appeal is limited to the trial court's failure to consider whether Dr. Wright's personal conduct or more specifically his bad faith motives preclude the attachment of HCQIA immunity.

for the doctors involved in the summary suspension was not appropriate, the court determined that there were factual issues with respect to whether, prior to issuing the suspension, defendants advised the plaintiff of specific complaints and "offered plaintiff the opportunity to give his side of the story and to address the concerns about plaintiff's conduct." *Id.* By contrast, here Plaintiffs have not asserted an absence of notice or an opportunity to be heard. Rather, Plaintiffs focus on Dr. Wright's subjective bad faith, detailing in their brief, interactions between Plaintiffs and Dr. Wright unrelated to the Ad Hoc Committee's activities, highlighting the fraud allegations and ignoring the record evidence that the committees considered quality of care concerns. As we stated in Misischia, "bad faith on the part of the reviewers is immaterial." 30 S.W.3d at 859.[8]

Plaintiffs' final argument is that Dr. Wright did not make "a reasonable effort to obtain the facts of the matter" because he: (1) "charged fraud the first thing out of the box," (2) did so without speaking to Dr. Assi, (3) never reviewed the relevant medical literature, (4) never looked at Medicare billing records, and (5) reviewed other cases before another committee. As an initial matter, Plaintiffs again improperly focus on Dr. Wright's conduct alone rather than whether the professional review action was taken after a "reasonable effort to obtain the facts of the matter." Here, St. Anthony's administrators formed a committee in response to the questions raised by Dr. Wright. The committee, composed of doctors in addition to Dr. Wright, reviewed the suspect cases, reviewed medical literature, solicited the

opinion of at least one well-regarded cardiologist outside St. Anthony's, notified Dr. Assi of the committee's concerns and permitted Dr. Assi to address the committee and provide information in support of his conduct. Ultimately, the committee took no adverse action. However, the record clearly supports a finding that the decision to take no adverse action was made after a "reasonable effort to obtain the facts of the matter." Point denied.

### Conclusion

This Court affirms the trial court's grant of summary judgment.

MARY K. HOFF, P.J., and CLIFFORD H. AHRENS, J., concur.

---

8. Plaintiffs also assert in the alternative, that "even if HCQIA did rule out considerations of bad faith ... Dr. Wright is not entitled to HCQIA because [St. Anthony's] has a good faith standard in its own by-laws." Plaintiffs

have cited no support for the proposition that St. Anthony's by-laws supplant the statutory criteria for HCQIA immunity provided in Section 11112(a).